CIV-COHN

04-60196

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-----------------------------------------------------------------------------MAGISTRATE JUDGE

The Pension Committee of the University of Montreal Pension Plan; The Altar
Fund; Aberdeen Investments, Ltd.; Aries Trading Ltd.; The Arrowsmith Fund,
Ltd.; AXA Alternative Advisors, Inc.; Banco Nominees (I.O.M.) Ltd; Bank of
Bermuda (Luxembourg) S.A.; Banque Privee Edmond de Rothschild Europe;
Banque Privee Edmond de Rothschild Europe/Isofin; John G. Barrie, Jr. IRA;
Base Force, Ltd.; Bombardier Trust (Canada); The Bombardier Trust (U.K.); The
Bombardier Trust (U.S.);  Commerzbank Capital Markets Corp.; Cedar Fund;
Clearwater Commercial Enterprises, Inc.; Commonfund Global Hedged
Partners, LLC; Condor Alternative Fund; The Corbett Family Charitable
Foundation, Inc.; The International Active Fund of Funds; Fortis Global Custody
Management and Trustee Services (Ireland) Ltd; Dirmica Investment, Ltd.;
Diversified Capital Management Ltd; Dominion Resources Inc. Master Trust;
Alain Dunand; Fondation Lucie et Andre Chagnon; 9091-2601 Quebec Inc.,
Assignee of Sojecci Ltee.; Claude Chagnon; Andre Chagnon; Fondation J.
Armand Bombardier; Fondation Lilla; Ethos Investments, Ltd; First Trust Corp.;
Goulam Investments Inc.; GT Alpha; Christa Gunter; Hermes Trading Ltd.;
HSBC Private Bank (Suisse) SA; HSBC Republic (USA) Inc.; Hunnicutt & Co.,
Inc.; IRA fbo Wiliam Hunnicut; Kredietbank Luxembourg; Kuwait and Middle East
Financial Investment Company; La Compagnie Financiere Edmond de
Rothschild Banque; Cecile Lescoat; LGT Bank in Liechtenstein, Ltd.; L.H.
Logarithm Holdings SA; Madison Textiles Ltd.; Maestro Trading, Inc.; Mirelis
InvesTrust SA; Vittorio Mosca; The Morton Meyerson Family Foundation; The
1999 Meyerson Charitable Remainder Trust; Multivalor Invest Inc.; National
Bank of Canada; Nemrod Leveraged Holdings Ltd; Nobilis S.A.; Suzanne Fontan
S.C.A; Halivest Sarl; Octogone Gestion SA; Okabena Marketable Alternatives
Fund LLC; Pictet & Cie Banquiers; The Pension Committee of Régime des
rentes du Mouvement Desjardins; Anne-Chantal Pigelet; The Trustees of RCA
in Trust; The Pension Committee of the pension plan for Regime de ratraite de la
Corporation de l'Ecole Polytechnique;  Rothschild Gestion; Satnam Investments
Ltd; Seven Seas Portfolio A Ltd; Signet Multi-Manager Inc; SIL Nominees
Limited; Sperry Complete Manager Fund Ltd.; SPGP (Societe Privee de Gestion
de Patrimoine); St. George's Trust Company Limited; Jo-Ann St. Germain; The
Stafford Fund Ltd; StarVest Funds Ltd.; The Taurus Trust; Team Haas USA, Ltd;
Trendtrust SA; UEB Geneva; James Vaughan; Venere Investments Limited;
Vidacos Nominees Ltd.; WestWind Foundation Holdings Ltd.; 169642 Canada,
Inc.; 171212 Canada, Inc.,

Plaintiffs

-against-

Banc of America Securities, LLC ; Citco Fund Services (Curacao) N.V.; The
Citco Group Limited; International Fund Services (Ireland) Limited;
PricewaterhouseCoopers (Netherlands Antilles ); John W. Bendall, Jr.; Richard
Geist;  Anthony Stocks; Kieran Conroy; and Declan Quilligan,

Defendants

SNOW

No.

**Complaint**

<u>Jury Trial
Demanded</u>

x





Plaintiffs, by their attorneys, Brown Rudnick Berlack Israels LLP, for their complaint against the above-named defendants, respectfully allege as follows:

## INTRODUCTION

1.     The plaintiffs in this action collectively invested over $460 million in two hedge funds, Lancer Offshore, Inc. ("Lancer Offshore") and The OmniFund Ltd. ("OmniFund")[1] (collectively referred to herein as the "Funds").   The Funds were managed by Michael Lauer ("Lauer") through Lancer Management Group, LLC ("Lancer Management"), the management company he owned and controlled.   The Funds are now in the process of being liquidated and it has become increasingly and distressingly clear that most of the capital invested in the Funds has been lost.   The investors seek through this action to redress their direct losses.

2.     This case involves egregious misconduct and recklessness.   Lauer repeatedly and falsely told plaintiffs that the Funds' assets were appreciating when, in fact, the Funds had lost virtually all of plaintiffs' money.   Plaintiffs reasonably relied on these misrepresentations when making investment decisions.   Each of the Investors was induced to invest in the Fund, and to pay inflated prices for shares in the Fund, by the persistently overstated valuations of the Funds' portfolios.   Thereafter, Lauer and other defendants intentionally caused plaintiffs to maintain their investments in the Funds by continuing to lie about the performance of the Funds' investments.

3.     At least in recent years, the Funds' holdings (the particular identity of which were often kept secret from the investors) consisted mainly of small or micro-cap stocks which were unlisted and only thinly traded on the over-the-counter market

---

[1] References to OmniFund are intended, unless specifically noted to the contrary, to include the Orbiter and Viator Funds, predecessor funds merged into OmniFund in or about April 2002.

2

and pink sheets. The Funds would initially acquire large, often controlling, stakes in these companies for a small investment. Then, shortly before month end, Lauer would cause the Funds to purchase a small number of shares at a price significantly higher than the original acquisition price. The Funds would then calculate their entire holding in the company at the now-inflated price reflected by the last "market" purchase. Lauer used these inflated prices to report positive performance results to investors.

4.      By "marking the close" in this manner, and employing other fraudulent devices, Lauer was able to make it appear as though the value of the Funds' portfolio was continually rising, even in a down market. This continually inflated performance induced Plaintiffs to invest and remain invested in the Funds, thereby increasing the management fees being earned by Lancer Management and others. Plaintiffs were not told that the Funds were valued using this fraudulent technique.

5.      The Funds' directors included Anthony J. Stocks, Kieran Conroy and Declan Quilligan, employees of the Funds' Administrator, Citco Fund Services (Curacao) N.V. (collectively the "Citco Directors") as well as John W. Bendall, Jr. and Richard Geist (collectively, all referred to as the "Director Defendants"). The Director Defendants are also responsible for the plaintiffs' losses because they breached their obligations to ensure that the Funds' portfolio were properly valued and reported to Plaintiffs.

6.      Lauer and the Director Defendants did not act – and, indeed could not have acted – alone in perpetrating this fraudulent scheme. The fraud would not have succeeded without the reckless and negligent conduct of the Funds' service providers, including their administrators, auditor and prime broker/custodian.

7.      Citco Fund Services (Curacao) N.V. ("Citco NV"), a division of The Citco Group and the administrator for the Funds, distributed materially false monthly NAV statements to plaintiffs.  Instead of conducting an independent valuation, as it was obligated to do, Citco NV simply used Lauer's fraudulent valuations in preparing the NAV statements.   Lauer provided Citco NV with, among other things, documents purporting to be position reports issued by the Bank's custodian and prime broker, Bank of America Securities, LLC ("B of A").  These reports were generated by Lauer from B of A's computer system and were based on inputs directly made by Lauer or by B of A employees at Lauer's direction.  Citco NV knew or should have known of the fraud because, among other things, three of its employees were also members of the Funds' Board of Directors.

8.      The  Funds'  auditors,  PricewaterhouseCoopers  (Netherlands Antilles) ("PWC NA"), recklessly and negligently ratified and confirmed the false valuations in annual audit reports disseminated directly to the plaintiffs.  PWC NA realized, or was reckless in failing to realize, that the Funds' financial statements, which it was auditing and certifying as accurate, fraudulently and dramatically overstated the Funds' assets, net worth and earnings along with concealing massive losses sustained by the Funds.  In the 2000 and 2001 audits, PWC NA represented that it had audited the Funds' financial statements in accordance with international standards on auditing, including representations that the audits had been planned and performed in order to obtain reasonable assurance, on the part of PWC NA, that the financial statements were free of material misstatements.  PWC NA failed to disclose that, in fact, it was

simply rubber-stamping the information received from Lauer, thus facilitating the fraud being perpetrated upon the investors.

9.    In addition to committing a direct fraud upon the plaintiffs and negligently performing their duties, Citco NV and PWC NA each materially assisted Lauer's effort to induce plaintiffs to purchase securities in the Funds at inflated prices and/or to forego their rights to withdraw their investments therein.  By creating and/or confirming false valuations of the Funds' assets, Citco NV and PWC NA each knowingly (or recklessly) and materially assisted Lauer and the Director Defendant's continuing fraud upon plaintiffs, and breach of fiduciary duty.

10.    B of A also substantially assisted Lauer and the Director Defendant's fraud and breach of duty.  B of A provided Lauer with access to its computer network, thereby allowing Lauer to generate position statements purporting to depict the Funds' holdings and the value of such holdings.  These reports, which were provided to Citco NV and PWC NA, appeared to be valuations undertaken by, or at least approved by B of A (the "B of A Position Reports").

11.    Upon information and belief, the valuations set forth in the B of A Position Reports, as well as other valuation information provided by Lauer, were used by the auditor and the administrators to create fraudulent NAV statements and audit reports.  Moreover, certain investors, including The Pension Committee of the University of Montreal and Fondation Chagnon, periodically received these B of A Positions Reports and relied upon them when making investment and retention decisions.  The fraud could not have occurred if B of A had denied Lauer access to its computer system or if B of A had ensured that the position reports were accurate.

12.    In September 2002, Citco NV resigned and was replaced by defendant International Fund Services (Ireland) Limited ("IFS").   IFS also negligently disseminated false, misleading and fraudulent NAV statements to investors based upon Lauer's false valuations and did not independently value the portfolios.

## THE PARTIES

### The Plaintiffs

13.    The plaintiffs are shareholders in the Funds.   It is the intent of the plaintiffs to pursue through this action only such claims as they own directly.

14.    Specifically, the plaintiffs are as follows:

a)    The Altar Fund, an exempted limited company incorporated under the laws of the Cayman Islands having a registered office c/oCitco Fund Services (Cayman Islands) Limited, Corporate Centre, West Bay Road, P.O. Box 31106 SMB, Grand Cayman, Cayman Islands, B.W.I., which invested $1,000,000 in Lancer Offshore on or about October 1, 2000, $500,000 in Lance Offshore on or about May 1, 2001, $100,000 in Lancer Offshore on or about August 1, 2002, $350,000 in Viator on or about October 1, 2000, $300,000 in Viator on or about December 1, 2000, $500,000 in Viator on or about February 1, 2001, $500,000 in Viator on or about March 1, 2001 and $500,000 in Viator on or about May 1, 2001;

b)    Aberdeen Investments Ltd., having an administration address at PO Box 300, 8034 Zurich, Switzerland, which invested $517,534.28 in Lancer Offshore between February 1998 and February 2002;

c)    Aries Trading, Ltd., having an address of Aktis 119, Faros Kavouri, Vouligameni 166-71, Greece which invested $105,000 in Lancer Offshore on or about April 1, 1997;

d)    The Arrowsmith Fund Ltd., having an address at Dockendale House, West Bay Street, P.O. Box N-4836, Nassau, Bahamas, which invested $1,976,433.10 in Lancer Offshore in or about June 2001, $887,640.80 in Lancer Offshore in or about May 2002 and $96,940.00 in Lancer Offshore in or about May 2002;

e)    AXA Alternative Advisors, Inc. in its capacity as investment manager and agent for AXA Alternatve Strategies Fund Ltd., AXA New Horizon Fund Select Dollar, AXA New Horizon Fund Select Euro and AXA New Horizon Fund Select Plus Euro and as subadvisor and agent for CIC Alternaif, having an address at 1370 Avenue of the Americas, 22nd Floor, New York,

New York 10019, which invested $15,000,000 in Lancer Offshore in or about June 2002;

f)      Banco Nominees (I.O.M.) Limited, having an address at P.O. Box 34, 12/13 Hill Street, Douglas, Isle of Man, IM99 IBW, British Isles, which invested $200,000 in Lancer Offshore on or about April 25, 2001, $200,000 in Lancer Offshore on or about August 10, 2001, $200,000 in Lancer Offshore on or about April 11, 2002 and $300,000 in Lancer Offshore on or about August 13, 2002;

g)      Bank of Bermuda (Luxembourg), S.A. with an address at P.O. Box 413, 13 Rue Goethe, 2014 Luxembourg, which invested on behalf of Liberty Ermitage North American Absolute Fund Ltd, $1,000,000 in Lancer Offshore on or about June 1, 2002 and $1,000,000 in Lancer Offshore on or about August 1, 2002;

h)      Banque Privee Edmond de Rothschild Europe, having an address at Societe anonyme, 20 boulevard Emmanuel Servais, L-2535 Luxembourg, which invested $1,640,463.96 in Lancer Offshore;

i)      Banque Privee Edmond de Rothschild Europe/Isofin having an address at 20 boulevard Emmanuel Servais, L-2535, Luxembourg, which invested $3,000,000 in Lancer Offshore ;

j)      John G. Barrie, Jr. IRA, an Individual Retirement Account ("IRA") held on behalf of John G. Barrie, Jr., who resides at 2331 Castleford Terrace, Midlothian, Virginia 23113, which invested $250,000 in Lancer Offshore on or about November 1, 2000;

k)      Base Force, Ltd., having an address in c/o Bruce Campbell & Co., P.O. Box 834, Bank of Nova Scotia Building, Grand Cayman, Cayman Islands, which invested $1,100,000 in Lancer Offshore;

l)      Bombardier Trust (Canada), as agent of the administrators of the pension funds of Bombardier Inc. whose assets are collectively invested in the Bombardier Trust (Canada) (Foreign Assets) Fund, a trust restated under and governed by the laws of the Province of Quebec (Canada), with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $20,000,000.00 in Lancer Offshore on or about January 1, 2000, $6,960,608.60 in Lancer Offshore on or about March 1, 2000 and $6,900,000.00 in Lancer Offshore on or about April 1, 2000;

m)      The Bombardier Trust (UK), a trust established under and governed by the laws of Northern Ireland, with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $6,000,000.00 in Lancer Offshore on or about March 1, 2000, $8,328,000.00 in Lancer Offshore on or about April 1, 2000, $7,750,000.00 in Lancer Offshore on or about March 1, 2002 and $3,000,000.00 in Lancer Offshore on or about June 1, 2002;

n)    The Bombardier Trust (U.S.) Master Trust, a trust established under and governed by ERISA and the laws of the State of Ohio, with an address in c/o Bombardier Inc., Corporate Office, 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8, which invested $8,459,000.00 in Lancer Offshore on or about October 1, 1999 and $1,025,940.01 in Lancer Offshore on or about December 1, 1999;

o)    Commerzbank Capital Markets Corporation in its capacity as investment manager for AIS Holdings Series Trust II and Commerzbank Global Alternative Limited and as subadvisor for Commerzbank Alternative Strategies, having an address at 1251 Avenue of the Americas, New York, NY 10020-1104, which invested $3,000,000 in Lancer Offshore on or about May 1, 2002;

p)    Cedar Fund, having an address in c/o Commerzbank Capital Markets Corporation, 1251 Avenue of the Americas, New York, NY 10020-1104, which invested $2,000,000 in Lancer Offshore;

q)    Clearwater Commercial Enterprises, Inc., having an address care of Bermuda Trust Company Limited, which invested $110,437.71 in Lancer Offshore and $203,165.65 in OmniFund;

r)    Commonfund Global Hedged Partners, LLC, having an address in care of Commonfund Asset Management Company, Inc., 15 Old Danbury Road, P.O. Box 812, Wilton, Connecticut 06897-0812, which invested $1,500,000 in Lancer Offshore on or about April 1, 2000, $1,500,000 in Lancer Offshore on or about June 1, 2000, $1,500,000 in Lancer Offshore on or about July 1, 2000 and $6,000,000 in Lancer Offshore on or about January 1, 2001;

s)    Condor Alternative Fund, having an address in c/o SV Alterinvest, 42 Avenue Montaigne, 75008, Paris, France, which invested $700,000 in Lancer Offshore in or about October 2000, $400,000 in Lancer Offshore in or about December, 2001, $400,000 in OmniFund in or about October 2000 and $500,000 in OmniFund in or about June 2001;

t)    The Corbett Family Charitable Foundation Inc., having an address of 2202 N. West Shore Blvd., Suite 110, Tampa, Florida 33607, which invested $2,000,000 in Lancer Offshore on or about September 29, 2000 and redeemed $400,000 from Lancer Offshore in or about June 2002;

u)    The International Active Fund of Funds, having an address in c/o Coronation Management Company Limited, which invested $20,750,000 in Lancer Offshore;

v)    Fortis Global Custody Management and Trustee Services (Ireland) Limited as trustee for Coronation Universal Fund, having an address in c/o Fortis Global Custody Management & Trustee Services (Ireland) Limited, which invested $8,000,000 in Lancer Offshore;

w)   Dirmica Investment Ltd having an address in c/o Mirabaud & Cie, Boulevard du Theatre, CH-1211, Geneve 11 Switzerland, which invested $3,899,675.54 in Lancer Offshore and $2,077,814.85 in OmniFund;

x)   Diversified Capital Management LTD,  an International Business Company incorporated in the British Virgin Islands, having an address of Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, BVI, which invested $3,000,000 in Lancer Offshore on or about May 1, 2002 and $3,000,000 in Lancer Offshore on or about June 1, 2002;

y)   Dominion Resources Inc. Master Trust, having an address  in c/o Dominion Resources Inc., 625 Liberty Avenue, Pittsburgh, Pennsylvania 15222, which invested $40,000,000 in Lancer Offshore between July 1999 and July 2002;

z)   Alain Dunand, an individual residing at 15 Rue de l'Eglise, 1270 Trelex, Switzerland, invested $250,000 in Lancer Offshore on or about November 2, 1998 and $200,000 in Lancer Offshore on or about February 1, 2000;

aa)  Ethos Investments Ltd, having an address in c/o S&A Papadimitrious & Co., 241, Syngrou Ave. & 2, Aikarnassou Str., Athens, Greece 171-22, which invested $200,000 in Viator on or about October 1, 2000;

bb)  First Trust Corp., as trustee f/b/o Paul J. Simon, as trustee f/b/o/ Shirley A. Simon and as trustee f/b/o Joseph Cueter, having an address in c/o US Group, 20580 Hoover Road, Detroit, Michigan, 48206 which purchased $1,465,000 in Lancer Offshore on or about January 30, 2001, $185,000 in Lancer Offshore on or about January 31, 2001, $290,000 in Lancer Offshore on or about January 30, 2001, $109,984.28 in Lancer Offshore in June of 2001 and $6,168.95 in Lancer Offshore in June 2001;

cc)  Fondation Lucie et Andre Chagnon, a Canadian charitable foundation with a principal place of business at 1010 de la Gauchetiere West, Suite 600, Montreal, Quebec, Canada H3B 2N2, which invested $50,000,000 in Lancer Offshore on or about March 1, 2001 and $50,000,000 in Lancer Offshore on or about December 1, 2001;

dd)  Claude Chagnon, an individual residing in Canada, who invested $5,000,000 in the Lancer Offshore on or about May 1, 2002;

ee)  Andre Chagnon, an individual residing at 521 De L'Anse, Vaudreuil, QC, J7V 8P3, Canada, who invested $2,000,000 in Lancer Offshore on or about June 1, 1998;

ff)  9091-2601 Quebec Inc., Assignee of Sojecci Ltee., having an address at 1010 de la Gauchetiere West, Suite 600, Montreal, Quebec, Canada H3B 2N2, which invested $6,000,000 in Lancer Offshore on or about October 1, 1999, $10,000,000 in Lancer Offshore on or about February 29, 2000 and $10,000,000 in Lancer Offshore on or about April 30, 2002 and which invested $2,000,000 in Orbiter on or about March 1, 2000, $2,000,000 in Viator on or about March 1, 2000;

9

gg)    Fondation J. Armand Bombardier, having an address at Edifice Sun Life, 1155 rue Metcalfe, 21e etage, Montreal, Quebec H3B 2V6, Canada, which purchased $2,700,000 in Lancer Offshore on or about November 30, 1999, $3,500,000 in Lancer Offshore on or about January 31, 2000 and $2,200,000 in Lancer Offshore on or about May 1, 2001;

hh)    Fondation Lilla, having an address c/o Mirabaud & Cie, Boulevard de Theatre, CH – 1211, Geneva, Switzerland, which invested $150,225.14 in Lancer Offshore;

ii)    Goulam Investments Inc., having an address in c/o Goulam Investment Ltd., 6111, du Boise, #4A, Montreal, Quebec H3S 2V8, which invested $500,000 in Lancer Offshore on or about November 30, 2001;

jj)    GT Alpha, having an address in care of GT Finance, Societe de Gestion 16, place de la Madeleine, which invested $900,000 in Lancer Offshore on or about January 1, 2002 and $300,000 in Lancer Offshore on or about July 1, 2002;

kk)    Christa Gunter, an individual who invested $100,0000 in Lancer Offshore;

ll)    Hermes Trading Ltd., having an address of Aktis 119, Faros Kavouri, Vouliagmeni 166-71, Greece, which invested $150,000 in Viator on or about October 1, 2000;

mm)    HSBC Private Bank (Suisse) SA (f/k/a HSBC Republic (Suisse) SA, having an address of 2 Quai General-Guisan, P.O. Box 3580, 1211 Geneva 3, Switzerland, invested $7,380,000 in Lancer Offshore and $255,000 in OmniFund between May 1997 and July 2002;

nn)    HSBC Republic (USA) Inc., having an address c/o HSBC Brokerage (USA) Inc., 1 West 39th Street, 11th Floor, New York, New York 10018, which invested $1,000,000 in Lancer Offshore;

oo)    Hunnicutt & Co., Inc. (Defined Benefit Plan), having an address in c/o Hunnicut & Co., Inc., 110 East 59th Street, Suite 3200, New York, New York 10022, which invested $580,361.10 in Lancer Offshore;

pp)    IRA f/b/o William Hunnicut VFTC as Custodian, having an address in c/o Hunnicut & Co., Inc., 110 East 59th Street, Suite 3200, New York, New York 10022, which invested $1,652,254.63;

qq)    Kredeitbank Luxembourg, A/C Special Opportunities Fund, having an address at 43 Boulevard Royal, L-2955 Luxembourg, which invested $1,300,000 in Lancer Offshore on or about July 1, 1998, $500,000 in Lancer Offshore on or about September 1, 1998, $1,400,000 in Lancer Offshore on or about December 1, 1999, $600,000 in Lancer Offshore on or about January 1, 2000, $226,207.62 in Lancer Offshore in or about 2001, $46,531.20 in Lancer Offshore on or about June 6, 2002 and $2,000,000 in Lancer Offshore on or about August 1, 2002 and which redeemed ($100,000) from Lancer Offshore on or about October 1, 1999,

($2,400,000) from Lancer Offshore on or about April 1, 2000 and ($2,000,000) from Lancer Offshore on or about October 1, 2000;

rr) Kuwait and Middle East Financial Investment Company, a company having an address in care of Kuwait and Middle East Financial Investment Company, PO Box 819 Safat 13009 Kuwait, which invested $1,000,000 in Lancer Offshore on or about November 1, 1997, $1,000,000 in Lancer Offshore on or about January 1, 1998,$10,000,000 in Lancer Offshore on or about May 1, 1998, $10,000,000 in Lancer Offshore on or about January 1, 2000, $1,500,000 in Lancer Offshore on or about March 1, 2000, $800,000 in Lancer Offshore on or about June 1, 2000, $750,000 in Lancer Offshore on or about June 1, 2000 and $250,000 in Lancer Offshore on or about June 1, 2002 and which redeemed ($181,755) from Lancer Offshore;

ss) La Compagnie Financiere Edmond de Rothschild Banque, an entity having an address c/o LCF Rothschild Multi Management 47, rue du Faubourg Saint-Honore, 75401 Paris Cedex 08, France, which invested $9,406,282.50 in Lancer Offshore between October 1997 and May 2002;

tt) Cecile Lescoat, an individual residing in France who invested $55,825.62 in Lancer Offshore;

uu) LGT Bank in Liechtenstein AG, an entity having an address c/o LGT Bank in Lichtenstein Ltd., Herrengasse 12, FL-9490 Vaduz, Furstentum, Lichtenstein, which purchased $834,701.43 in Lancer Offshore in or about October 1999;

vv) L.H. Logarithm Holdings SA, having an address in c/o Rene Merkt Associes 15, rue General-Dufour, Case Postale 5556, CH-1211 Geneve 11 Switzerland, which invested $193366 in OmniFund on or about August 2, 2001 and $49,999.66 in OmniFund on or about November 30, 1999;

ww) Madison Textiles, LTD, a company limited by shares incorporated in Guernsey, the Channel Islands on August 24, 1990 with a registered office in Havelet Howe, South Esplanade 181, St. Peter Port, Guernsey, which invested $500,000in Lancer Offshore in March 1997, $500,000 in Lancer Offshore in August 1997, $1,000,000 in Lancer Offshore in November 1997 and $1,500,000 in Lancer Offshore in June 1998 and which redeemed ($500,000) from Lancer Offshore in January 2001 and ($2,000,000) from Lancer Offshore in April 2002 and which invested $500,000 in Orbiter on or about March 1, 1999, $552,718 in Orbiter on or about July 1, 1999, $1,000,000 in Viator on or about October 15, 1999, $250,000 in Orbiter on or about January 1, 2001, $250,000 in Viator on or about January 1, 2001 and $2,000,000 in OmniFund on or about April 1, 2002;

xx) Maestro Trading, Inc., having an address in c/o Vergotis, 13-15 Dimitros Street, P. Faliron, Athens 17562, Greece, which invested $100,000 in Lancer Offshore in or about June 1998;

yy)   Mirelis InvesTrust SA, having an address of 12, rue de la Corraterie, 12 Geneva 11, Switzerland, which invested $3,500,000 in Lancer Offshore;

zz)   Vittorio Mosca, an individual residing in Italy, who invested $500,000 in Lancer Offshore;

aaa)  The Morton Meyerson Family Foundation, a foundation and Texas non-profit corporation, having an address of 7800 Northaven Road, Dallas, Texas 75230, which invested $3,000,000 in Lancer Offshore between March and April, 2002;

bbb)  The 1999 Meyerson Charitable Remainder Trust, having an address of 3401 Armstrong Avenue, Dallas, Texas 75205, which invested $4,000,000 in Lancer Offshore in March 2002;

ccc)  Multivalor Invest Inc., a Panamanian corporation, having a registered office at Chase Manhattan Bank Building, via Espana 120, 2nd Floor, Panama, Republic of Panama, which invested $252,033.40 in Lancer Offshore on or about January 31, 1997;

ddd)  National Bank of Canada, having an address at 1155 Metcalfe, Ground Floor, Montreal, Quebec H3B 5G2, which invested $10,000,000 in Lancer Offshore;

eee)  Nemrod Leveraged Holdings Ltd., having an address in c/o Rothschild & Cie Gestion, 42 Rue d'Anjou, 75008, Paris, France, which invested $700,000 in Lancer Offshore on or about February 1, 1999, $500,000 in Lancer Offshore on or about March 1, 2000, $500,000 in Lancer Offshore on or about October 1, 2000, $300,000 in Lancer Offshore on or about August 1, 2001, $1,000,000 in Lancer Offshore on or about November 1, 2001, $1,000,000 in Lancer Offshore on or about April 1, 2002, $1,000,000 in Lancer Offshore on or about May 1, 2002, $1,000,000 in Lancer Offshore on or about July 1, 2002, and $1,000,000 in Lancer Offshore on or about August 1, 2002;

fff)  Nobilis S.A., Suzanne Fontan S.C.A. Halinvest Sarl, (collectively the "Nobilis Group"), entities having an address in c/o Nobilis, S.A., 29 Rue Bonaparte, 75006 Paris, France, which invested $500,000 in Lancer Offshore on or about March 1, 2000 and $1,500,000 in Lancer Offshore on or about August 1, 2002 on behalf of Nobilis S.A., $500,000 in Lancer Offshore on or about March 6, 2000, $500,000 in Lancer Offshore on or about August 1, 2002 on behalf of Suzanne Fontan S.C.A. and $425,000 in Lancer Offshore on or about August 1, 2002 on behalf of Halinvest Sarl;

ggg)  Octogone Gestion SA, an entity located at 26, rue de Candolle, CH-1205 Geneva Switzerland, which invested $200,000 in Lancer Offshore in or about March 2001, $100,000 in Lancer Offshore in or about April 2001, $100,000 in Lancer Offshore in or about June 2001, $200,000 in Lancer Offshore in or about June 2001, $500,000 in Lancer Offshore in or about April 2002, $120,000 in Lancer Offshore in or about March 2002, $190,000 in Lance Offshore in or about March 2002, $290,000 in Lancer

Offshore in or about March 2002, $125,000 in Lancer Offshore in or about May 2002, $25,000 in Lancer Offshore in or about June 2001, $50,000 in Lancer Offshore in or about December 2001, $25,000 in Lancer Offshore in or about April 2002, $45,000 in Lancer Offshore in or about June 2001, $30,000 in Lancer Offshore in or about April 2002, $40,000 in Lancer Offshore in or about April 2002, $50,000 in Lancer Offshore in or about July 2001, $70,000 in Lancer Offshore in or about December 2001, $100,000 in Lancer Offshore in or about June 2001, $100,000 in Lancer Offshore in or about April 2002, $25,270 in Lancer Offshore in or about April 2002, $16,837 in Lancer Offshore in or about June 1998, $37,910 in Lancer Offshore in or about January 2002, $12,090 in Lancer Offshore in or about January 2002, $20, 712 in Lancer Offshore in or about June 1998, $240,000 in Lancer Offshore in or about June 2001 and $350,000 in Lancer Offshore in or about November 2001;

hhh)   Okabena Marketable Alternatives Fund, LLC, a limited liability corporation, having an address in c/o Okabena Investment Services Inc., 5410 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota, 55402-4139, which invested $2,000,000 in Lancer Offshore on or about January 4, 1999, $1,000,000 in Lancer Offshore on or about February 1, 1999, $1,500,000 in Lancer Offshore on or about March 1, 1999, $1,000,000 in Lancer Offshore on or about April 1, 1999, $1,500,000 in Lancer Offshore on or about October 1, 1999, $2,500,000 in Lancer  Offshore on or about April 3, 2000 and $1,300,000 in Lancer Offshore on or about January 2, 2001 and which redeemed ($3,000,000) from Lancer Offshore on or about January 3, 2002;

iii)   The Pension Committee of the University of Montreal, in its capacity as administrator and agent for the University of Montreal Pension Plan, having an address in c/o University of Montreal, Investment Management, Pension Fund, Building 3744 Jean-Brillant suite 108, Montreal Quebec H3T 1P1, Canada, which invested, through its custodian Fiducie Desjardins, $17,000,000 in Lancer Offshore on or about July 1, 1998, $15,000,000 in Lancer Offshore on or about October 1, 1999, $14,000,000 in Lance Offshore in or about October 1999, $6,000,000 in Lancer Offshore on or about April 1, 2000 and $15,000,000 in Lancer Offshore on or about May 1, 2000;

jjj)   The Pension Committee of Régime des rentes du Mouvement Desjardins, with an address at 100 avenue des commandeurs, Lévis, Province of Quebec, Canada, QC G6V 7N5, which invested through its custodian Fiducie Desjardins $10,000,000 in Lancer Offshore;

kkk)   Anne-Chantal Pigelet, an individual residing at 344 rue Chenal, 74700 Sallanches, Paris, France, who invested $349,994.33 in Lancer Offshore and $30,494.00 in OmniFund;

lll)     Pictet & Cie Banquiers, having an address of Boulevard Georges-Favon 29, Case Postale 5130, CH-1211 Geneva, Switzerland, which invested $5,277,076.30 in Lancer Offshore;

mmm) Irving Teitelbaum, Stephen Gross and Laurence Lewin in their capacity as the Trustees of RCA in Trust, having an address at 1604 St. Regis Blvd., Dorval, Quebec, Canada H9P 1H6, which invested $140,000 in Lancer Offshore on or about May 1, 2002;

nnn)    The Pension Committee of the Pension Plan for the Régime de retraite de la Corporation de l'Ecole Polytechnique, having an address in c/o Ecole Polytechnique Montreal, C.P. 6079, succ. Centre-ville, Montreal, Quebec Canada H3C 3A7, which invested $6,813,844.77 in Lancer Offshore on or about April 1, 2000, $3,186,155.23 in Lancer Offshore on or about April 1, 2000, $6,230,500 in Lancer Offshore on or about June 1, 2000 and $650,480 in Lancer Offshore on or about July 1, 2000;

ooo)    Rothschild Gestion, having an address in c/o Rothschild & Cie Gestion, 42 Rue d'Anjou, 75008, Paris, France, which invested $500,000 in Lancer Offshore;

ppp)    Satnam Investments Ltd., having an address in c/o EFG Financial Advisory Pte Ltd., 1 Raffles Place, #42-00, OUB Centre, Singapore 048616, which invested $1,000,000 in Lancer Offshore on or about May 1, 1999;

qqq)    Seven Seas Portfolio A Limited, an entity incorporated under the laws of Bermuda having an address at 6 Front Street, Hamilton HM 11, P.O. Box HM 1020, Hamilton HM DX, Bermuda, which invested $1,000,000 in Lancer Offshore;

rrr)    Signet Multi-Manager Inc. and UEB (United European Bank) Geneva (Switzerland), having addresses in care of Signet Management Limited 9 Columbus Centre, Pelican Drive, Road Town, Tortola, British Virgin Islands, which invested, collectively, $500,000 in Lancer Offshore on or about March 1, 1997, $200,000 in Lancer Offshore on or about March 1, 1997, $300,000 in Lancer Offshore on or about March 1, 1997, $250,000 in Lancer Offshore on or about January 1, 1998, $250,000 in Lancer Offshore on or about April 1, 1998, $400,000 in Lancer Offshore on or about July 1, 1998, $200,000 in Lancer Offshore on or about June 30, 1999, $700,000 in Lancer Offshore on or about June 1, 2000 and $780,866.74 in Lancer Offshore on or about June 1, 2000 and which redeemed ($300,000) from Lancer Offshore on or about January 1, 1999, ($300,000) from Lancer Offshore on or about January 1, 1999, ($250,000) from Lancer Offshore on or about August 1, 1999, ($200,000) from Lancer Offshore on or about September 1, 1999, ($300,000) from Lancer Offshore on or about February 1, 2000, ($250,000) from Lancer Offshore on or about February 1, 2000, ($300,000) from Lancer Offshore on or about March 1, 2000, ($600,000) from Lancer Offshore on or about February 1, 2001, ($200,00) from Lancer Offshore on or about April 1,

2001 and ($200,000) from Lancer Offshore on or about June 1, 2001), for a total of $680,866.74 in unredeemed investment;

sss)   SIL Nominees Limited, a Cayman Islands entity having an administrative office at 2 Jane Street, Suite 501, Toronto, Ontario M6S 4W3 Canada, which invested $250,000 in Lancer Offshore in or about June 1997, $500,000 in Lancer Offshore in or about December 1997, $170,000 in Lancer Offshore in or about March 1998 and $500,000 in Lancer Offshore in or about December 2000;

ttt)   Sperry Complete Manager Fund Ltd., having a registered office c/o Citco, Bahamas, which invested $350,000 in Lancer Offshore on or about July 1, 1996, $200,000 in Lancer Offshore on or about December 2, 1996, $501,314.64 in Lancer Offshore on or about November 1, 1999, $98,683.98 in Lancer Offshore on or about December 1, 1999, $68,120.83 in Lancer Offshore on or about January 1, 2000 and $26,301 in Lancer Offshore on or abour November 1, 2000;

uuu)   SPGP (Societe Privee de Gestion de Patrimoine), having an address 17 avenue Matignon, 75008 Paris, France, which invested $1,000,000 in Lancer Offshore;

vvv)   St. George's Trust Company Limited, having an address of 27 Reid Street, 1st Floor, P.O. Box HM 3051, Hamilton, HM 11, Bermuda, which invested $500,000 in Lancer Offshore on or about February 3, 1997;

www)   Jo-Ann St Germain, an individual residing at 940 Lake Shore Road, Dorval QC H9S 2C5, Canada, who  invested $258,500 in Lancer Offshore;

xxx)   The Stafford Fund Ltd., successor to Stafford Opportunity Fund, Ltd., a BVI entity having an address of in c/o Fairway Investment Partners AG, Nueschelerstrasse 35, 8001 Zurich, which invested $600,000 in Lancer Offshore on or about May 29, 1998 and $500,000 in Lancer Offshore on or about February 1, 2000;

yyy)   StarVest Funds Ltd., having an address  in c/o Bank of Bermuda Limited, 6 Front Street, Hamilton HM 11, Bermuda, which invested $6,000,000 in Lancer Offshore on or about January 1, 2002 and $500,000 in Lancer Offshore on or about June 1, 2002;

zzz)   The Taurus Trust, a Pennsylvania irrevocable trust, having an address in care of Duane Morris LLP, One Liberty Plaza, Philadelphia, PA, 19103-7396 and successor-in-interest to Turkos Seventeen Limited, which invested $100,000.46 in Lancer Offshore on or about February 27, 1998;

aaaa)   Team Haas USA, Ltd., a Cayman Islands corporation, having an address of 15 Rue Du Jeu-De-L'arc, Case Postale 6259, CH 1211 Geneve, Switzerland, which invested $1,500,000 in Lancer Offshore in April 2001;

bbbb)   Trendtrust SA, having an address at Rue du Mont-Blanc 3, CH-1201 Geneve Switzerland, which invested $1,000,000 in Lancer Offshore;

cccc)  James Vaughan, who through his retirement account invested $660,000 in Lancer Offshore;

dddd)  Venere Investments Limited, having an address in c/o Fiduciare Tucker, Route de Denges 28G, 1027 Lonay, Switzerland, which invested $690,000 in Lancer Offshore;

eeee)  Vidacos Nominees Limited, having an address in c/o Liberty Ermitage, 1st Floor, 47 The Esplanade, St. Helier, Jersey, Channel Islands, JE1 9LB, which is the custodian for shares representing $1,500,000 invested in Lancer Offshore on or about January 1, 2002;

ffff)  WestWind Foundation Holdings Ltd., having an address of WestWind Foundation Holdings, Ltd, PO Box 26 GT, Grand Cayman, Cayman Islands, B.W.I., which invested $1,400,000 in Lancer Offshore on or about July 1, 1999, $500,000 in Lancer Offshore on or about January 1, 2000 and $2,000,000 in Lancer Offshore on or about April 1, 2000;

gggg)  169642 Canada, Inc., having an address c/o Len-Jay, Inc., 5640 Thimens, St-Laurent, Quebec, H4R 2K9, which invested $100,000 in OmniFund;

hhhh)  171212 Canada, Inc., having an address at 12436 Notre Dame East, Montreal, QC H1B 2Z1, which invested $1,000,000 in Lancer Offshore on or about February 1, 2000.

**The Defendants**

15.  Upon information and belief, Michael Lauer resides at 7 Dwight Lane, Greenwich, Connecticut 06831.  At all relevant times, Lauer was the founder, manager and principal owner of Lancer Management, which acted as the Investment Manager for the Funds and which had its principal office in New York City.  Pursuant to the Case Management Order entered in the case of *Securities and Exchange Commission v. Lauer, et al.*, No. 03-80612 on January 8, 2004 (the "CMO"), plaintiffs are at this time prohibited from bringing any claims against, *inter alia*, Lauer and Lancer Management without first obtaining court approval.

16.  Upon information and belief, defendant John W. Bendall, Jr. conducts an investment business in New York, New York under the name of Hermitage Capital Corporation and has been a director of both Lancer Offshore and OmniFund since early 2002.

17.     Upon information and belief, defendant Richard Geist resides in Massachusetts and has been a director of both Lancer Offshore and OmniFund since early 2002.

18.     Upon information and belief, defendant Anthony Stocks ("Stocks") was a director of Lancer Offshore from 1995 until his resignation in or around July 2001 and resides in London, England.  Stocks was also a Director of the International Fund Services division of The Citco Group Limited during this time period.

19.     Upon information and belief, defendant Kieran Conroy ("Conroy") was a director of Lancer Offshore from 1998 until early 2002 and resides in Dublin, Ireland.  Conroy was also a Managing Director of Citco NV during this time period.

20.     Upon information and belief, defendant Declan Quilligan ("Quilligan") was a director of Lancer Offshore from 2001 until early 2002 and resides in Curacao, Netherlands Antilles.  Quilligan was also General Manager and Managing Director of Citco NV.

21.     Upon information and belief, The Citco Group Limited ("The Citco Group") is an independent financial services organization with approximately 46 offices in 27 countries around the world, including offices in New York and has its principal place of business at Corporate Centre, West Bay Road, Grand Cayman, Cayman Islands-British West Indies.  One of its regional offices is defendant Citco Fund Services (Curacao), N.V.  The Citco Group represents that it is the world's top provider of hedge fund administration services and administers more than 1200 funds with more than $110 billion in assets.  The Citco Group also represents that by administering funds in offices throughout the world it is able to provide a "consistent service platform" and that

it is a "global fund administrator".  Further, The Citco Group states that its "mission is to provide superior performance in the area of asset protection, delivered through our high level of responsibility, continuity, accuracy, and responsiveness."  The Citco Group allows its personnel "the ability to transfer between offices and divisions" in order to maintain consistent levels of excellence.

22.     Upon information and belief, Citco NV is a business entity organized and existing under the laws of the Netherlands Antilles, having places of business at Kaya Flamboyan 9, P.O. Box 812, Curacao, Netherlands Antilles and Citco Building, Wickams Cay, Road Town, Tortola, British Virgin Islands.  Citco NV is a division and wholly-owned and controlled subsidiary of The Citco Group.

23.     Upon information and belief, PWC NA is a Netherlands Antilles civil partnership formed by limited liability companies under Netherlands Antilles law and is a member of PricewaterhouseCoopers International Limited, a company limited by guaranty registered in England and Wales.  PWC NA has a place of business at P.O. Box 360, Julianaplein 38, Willemstad – Curacao, Netherlands, Antilles.  PWC NA, through its client and professional relationships, derives substantial revenue from activities throughout the United States.

24.     Upon information and belief, B of A is a limited liability corporation organized and existing under the laws of the State of New York, having its principal place of business therein at 9 West 57th Street, 17th Floor, New York, New York 10019. B of A, through its business activities and relationships, derives substantial revenues from the United States, including New York.

25.     Upon information and belief, International Fund Services (Ireland) Limited is a business entity organized and existing under the laws of Ireland, having a place of business at Third Floor, Bishop's Square, Redmond's Hill, Dublin 2, Ireland. IFS, through its business activities and relationships, derives substantial revenues from the United States.

## JURISDICTION AND VENUE

26.     This Court has original and/or supplemental subject matter jurisdiction over all claims at issue in this action pursuant to, <u>inter alia</u>, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1367.  The defendants conducted substantial activities in the United States, and their conduct here directly caused the plaintiffs' losses.  Among other things, defendants interacted on a regular basis with Lauer and Lancer Management, both of whom conducted their business affairs from the United States.  Many of the false and fraudulent statements were created in the United States and sent from there to the administrators for ultimate distribution to the investors.   Regular investor conference calls were initiated by Lauer from within the United States. Many of the securities purchases made on behalf of the Funds were executed on national stock exchanges in the United States and involved companies based in Florida.  Lauer and Lancer Management had regular contact with individuals in Florida relating to these investments.  Moreover, defendants committed acts outside of the United States which caused injury within the United States.  Finally, all of the claims asserted herein are so related, and derive from the same set of operative facts, as to constitute a single case or controversy.

27.     Moreover, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 754 and the CMO, which mandates that this action must be commenced in this Court.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial amount of the events or omissions giving rise to the claims asserted herein occurred in this District.  Venue is also proper in this District pursuant to the CMO.

29.     This Court has personal jurisdiction over Bendall and Geist because both of them are residents of the United States.  In addition, the Court has personal jurisdiction over all of the Director Defendants because they performed substantial business activities for the Funds which were managed by Lauer and Lancer Management in the United States.  Furthermore, the Director Defendants knew, or reasonably should have known, that many investors in the Funds were located in the United States and that information relating to the Funds, including offering materials specifically identifying the Director Defendants was sent to those investors located in the United States.  Moreover, each of the Citco Directors participated in the fund administration activities engaged in by Citco NV and, thus, the activities of Citco NV which were directed to the United States and Florida must be imputed to the Citco Directors.

30.     This Court has personal jurisdiction over Citco NV because it performs fund administration services for hundreds of companies throughout the world, including many based in, and/or having investors located in, the United States.  As a result of such regular, systematic and continuous business activities, Citco NV derives

substantial revenue from the United States, including Florida.  Moreover, Citco NV had specific and regular communications with the investors in the Funds, many of whom were located in the United States.

31.    This Court has personal jurisdiction over The Citco Group because it is a worldwide company with offices located throughout the world, including at least two in Florida itself, through which it conducts regular, systematic and continuous business activities resulting in the derivation of substantial revenues from the United States and Florida.

32.    This Court has personal jurisdiction over PWC NA because it provides auditing and accounting services to hundreds of companies throughout the world, including many based in, and/or having substantial contacts with, the United States.  As a result of such regular, systematic and continuous business activities, PWC NA derives substantial revenue from the United States, including Florida.  Moreover, PWC NA specifically addressed its audits to investors in the Funds, many of whom were located in the United States.

33.    This Court has personal jurisdiction over IFS because it also performs fund administration services for hundreds of companies throughout the world, including many based in, and/or having investors located in, the United States.  As a result of such regular, systematic and continuous business activities, IFS derives substantial revenue from the United States, including Florida.  Moreover, IFS had specific and regular communications with the investors in the Funds, many of whom were located in the United States.

34.     This Court has personal jurisdiction over B of A because it performs brokerage services for hundreds of companies throughout the world States, including many based in, and/or having investors located in, the United States.  As a result of such regular, systematic and continuous business activities, B of A derives substantial revenue from the United States, including Florida.

35.     Moreover, pursuant to 28 U.S.C. § 1692, this Court has personal jurisdiction over those defendants residing in, or otherwise present in, the United States.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

### The Funds and Lancer Management's Role

36.     Lancer Offshore was incorporated as an International Business Company, or IBC, in the British Virgin Islands ("BVI") on September 27, 1995.  At the time of its incorporation, its registered offices were at Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.  In December 1998 Lancer Offshore gained recognition as a professional mutual fund.

37.     OmniFund was formed on or about April 2, 2002 through the merger of two existing funds: The Orbiter Fund, Ltd. ("Orbiter") and The Viator Fund ("Viator").  Orbiter had originally been incorporated as an IBC in the BVI on January 29, 1999 and was recognized as a professional mutual fund in February 1999.  Viator had originally been incorporated as an IBC in the BVI on September 30, 1999 and was later also recognized as a professional mutual fund.  Like Lancer Offshore, at the time of their incorporation, both Orbitor and Viator listed their registered offices at Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands (references to "OmniFund" herein shall, unless indicated specifically to the contrary, intend to refer to Orbiter, Viator and the OmniFund).

22

38.     Lancer Management was formed to manage the Funds in exchange for receiving certain fees, based on the Funds' performance. Lancer Management's advisory fee for managing Lancer Offshore was approximately 1% per year, and was calculated by multiplying the Funds' NAV at the beginning of each fiscal quarter by 0.25%. Lancer Management also received an "incentive fee" equal to 20% of the net profits of the Lancer Offshore, as calculated on the last day of the Funds' fiscal year. Lancer Management's advisory fee for managing Orbiter was 1.5% per year, while its incentive fee was 50%. Lancer Management's advisory fee for managing Viator was 1%, while its incentive fee was 25%. Lancer Management's advisory fee for managing OmniFund was 2% while its incentive fee was 25%.

39.     Investors were solicited through letters, mailings, meetings, marketing materials and private placement memoranda ("PPMs"). Upon information and belief, the PPMs for Lancer Offshore and OmniFund were substantially similar.

**The Valuation Fraud**

40.     The Funds' investment strategy was one purportedly "concentrated" on investments in small and mid cap companies that were "investment community pariahs."

41.     Over the last three years, the Funds have relied on a few purportedly highly valued small cap issuers to comprise a substantial portion of their portfolios. Contrary to what had been represented in the PPMs, a majority of the stocks in which the Funds have been heavily invested were unlisted and traded on the OTCBB and pink sheets. These stocks were thinly traded and illiquid. Despite the fact that most of the issuers in which the Funds were heavily invested had virtually no operations

or earnings, Defendants assigned values to them in the hundreds of millions of dollars.

For example:

- As of December 31, 2000, 2001, 2002 and April 30, 2003, Lancer Offshore held shares and warrants in Fidelity First Financial Corporation ("Fidelity First") valuing them at approximately $22.55 million, $6.89 million, $46.34 million and $64.19 million, respectively.  OmniFund valued the shares and warrants it held on those year-end dates at $9.27 million, $1.2 million and $2.09 million.  In 2000, Fidelity First exited the mortgage business and since that time has essentially been a non-operating, shell corporation.  Fidelity First, which has traded on the pink sheets since November 1999, had no revenues for 2001 and 2002, lost millions of dollars since 2000 and had total assets of a mere $25,101 as of December 31, 2002.

- As of December 31, 2001 and 2002, and April 30, 2003, Lancer Offshore held shares in Biometrics Security Technology, Inc. (f/k/a Aug Corp.) ("Biometrics"), valuing them at approximately $61.2 million, $162.55 million and $75.76 million, respectively.  OmniFund valued the shares and warrants it held on those year-end dates at $11.56 million and $15.81 million.  Biometrics' common stock had been quoted on the OTCBB from December 2001 through May 23, 2003.  On May 23, 2003, Biometrics was delisted from the OTCBB and it currently trades on the Pink Sheets.  In 2001, Biometrics had no revenues, negative cash flow from operations of $385,593, and an accumulated deficit of $22,371,214.  Biometrics' current results for all of 2002 are unknown because Biometrics' last public filing containing financial information was a Form 10-QSB for the period ended September 30, 2002, at which time Biometrics reported total revenues for the nine months of just $68,936.

- As of December 31, 2000 and 2001, Lancer Offshore held shares and warrants in SMX Corp. ("SMX"), valuing them at approximately $152.98 million and $133.42 million, respectively.  OmniFund valued the shares and warrants it held on those year-end dates at $8.5 million and $15.11 million.  SMX has traded on the pink sheets since December 2000. In fiscal 2000, SMX had no revenues and a net loss of $415,356.  By December 31, 2001, SMX had revenues of $99,441, assets of a mere $1.28 million and its losses had increased to $4.31 million.

- As of December 31, 2000, 2001, 2002 and April 30, 2003, Lancer Offshore held shares and warrants in XtraCard Corp. (f/k/a Nu-D-Zine, Inc.) ("XtraCard"), valuing them at approximately $22.16 million, $84.12 million, $102.98 million and $58.86 million, respectively.  OmniFund valued the shares and warrants it held on December 31, 2002 at $6.0 million.  XtraCard has traded on the pink sheets since February 2000.  XtraCard earned no revenue in 2000 and 2001; in 2002 it showed revenues of only $152,407.  On December 31, 2002, XtraCard had assets of less than $2 million.

- As of December 31, 2001, 2002 and April 30, 2003, Lancer Offshore held shares in Total Film Group, Inc. ("Total Film"), valuing them at approximately $36.46

million, $37.7 million and $44.06 million, respectively.   OmniFund valued the shares and warrants it held on those year-end dates at $12.1 million and $5.0 million.  Total Film traded on the OTCBB from May 2001 until April 2002 at which point it began trading exclusively on the pink sheets.  In 2000-2001 Total Film had revenues of $1.8 million and a loss of $8.95 million in the nine months (ending March 31, 2001) before it stopped filing with the SEC.

   42. The values assigned to the Funds were directly tied to the closing prices of the securities in which the Funds were invested.  The Funds' PPM provided that the Funds' NAV would be calculated as follows:

> [listed or quoted securities are to] be valued at their last sales prices on the date of determination, or if no sales occurred on such date at the mean between "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Board of Directors.

> [If securities are not listed, they] shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities by the Board of Directors.."

   43. The PPMs also contained a caveat that in the event the Board of Directors determined that the listed valuation method did not represent its market value the Board of Directors would value the securities as it reasonably determined.

   44. As described in detail below, from at least March 2000, the NAVs were intentionally, and fraudulently, inflated by manipulating the month end closing prices of certain securities in which the Funds were heavily invested.

   45. According to the SEC, Lauer and/or Lancer Management purchased for the Funds substantial, sometimes controlling blocks of these thinly traded stock in off-market trades.  Subsequently, on or near monthly valuation dates, Lauer

and/or Lancer Management purchased a small number of additional shares at prices that were significantly higher than the Funds' initial acquisition price. Following the purchase, Lauer and/or Lancer Management would calculate the value of the Funds' entire holding of that security based on the artificial price achieved through the recent limited value transaction at the increased price. These purchases were made with the intent to raise the closing market price of certain stocks in the Funds' portfolios.

46.     These rigged closing prices were then used in valuing the Fund's securities and in calculating the Funds' performances and NAVs which were disseminated to investors each month and to potential investors. The inflated valuation of these positions was provided to Citco NV and PWC NA which used the inflated values to prepare monthly NAV statements and annual audit reports respectively. The fraudulent performance reports induced plaintiffs to invest in the Funds and remain invested in the Funds.

47.     The purpose of such activity was to allow Lauer and Lancer Management to "earn" millions of dollars in management and incentive fees. Lancer Offshore's financial statements reveal that "Management fees" of $1,524,406 were paid in 2000 and $1,607,928 in 2001. The unaudited financial statements reveal an additional $2,117,200 in Management fees as of June 30, 2002. Moreover, the audited financial statements reveal that $15,915,593 and $13,548,193 in "Incentive Fees" were payable in 2000 and 2001 respectively. These same statements reveal an additional $44,006,726 (for 2000) and $48,264,309 (or 2001) as deferred incentive fees payable. The unaudited financial statements reveal $8,937,540 in "Incentive Fees" payable and $61,113,468 in deferred incentive fees payable as of June 30, 2002.

48.     This fraudulent manipulation was used for many of the securities in which the Funds were invested, including for example, Lighthouse Fast Ferry, Inc. ("Lighthouse"), the manipulation of which is illustrative of Lauer's fraudulent scheme. On October 31, 2001, Lancer Management purchased 40,000 shares of Lighthouse at the end of the trading day, representing the largest single day volume in the month of October.   Lancer Management thereby controlled and dominated the market for Lighthouse's common stock and its manipulative trading caused Lighthouse's stock price to rise dramatically on October 31, 2001 to $2.15 per share from the previous day's closing price of $1.60 per share (a 34% increase over the previous day).   The Funds' complete holdings in Lighthouse were then valued at the materially overstated value of $2.15 per share.   Utilizing this technique of "Marking the Close," Lauer successfully manipulated the closing price of Lighthouse's stock on April 30, 2001, June 29, 2001, July 31, 2001, August 31, 2001, September 28, 2001, November 30, 2001, December 26, 2001, December 28, 2001 and December 31, 2001.

49.     Similar trading patterns were employed in relation to other holdings, including Biometrics Security Technology, Inc., Fidelity First Financial Corp., SMX Corp., XtraCard Corp., Continental Southern Resources and Total Film Group. Lauer's fraudulent scheme succeeded in significantly overstating the values assigned to Lancer Offshore Fund's stock portfolio.   While the book (cost) value of Lancer Offshore Fund's portfolio as of December 31, 2002 was $259,307,486, the reported value was $824,523,879.   This unrealized increase in value was not based on any actual increase in value but was the result of Lauer's manipulation of the NAV.

50. Lancer Offshore Fund's annual report for 2000, which was audited by PWC NA, stated that the Fund's NAV for the month ending December 31, 2000 was $840.22 per share. Upon information and belief, at the time, this valuation was materially false and grossly overstated the actual NAV.

51. In 2002, Lauer and Lancer Management reported that Lancer Offshore Fund's NAV for the month ending December 31, 2001 was $915.43 per share. Upon information and belief, at the time, this valuation, again audited and certified by PWC NA, was materially false and grossly overstated the actual NAV.

52. In 2003, Lauer and Lancer Management reported that Lancer Offshore Fund's NAV for the month ending December 31, 2002 was $768.46 per share. Upon information and belief, this valuation was materially false and grossly overstated the actual NAV.

**Additional Material Misrepresentations and Omissions**

53. In addition, Lauer made other materially false and misleading statements in various offering materials and newsletters about the Funds' holdings, performances, values and management backgrounds.

54. For example, the Funds' PPMs misrepresented the type of investments the Funds would make. Specifically, the PPMs represented that most investments made by the Funds would trade on "listed exchanges." In truth, a majority of the Fund's investments were and are on unlisted exchanges such as the OTCBB or pink sheets. The PPM also stated, under a section titled "Investment Restrictions," that the Fund would not allow any one investment to comprise more than 20% of its total assets and that the "Fund may not take or seek to take legal or management control of

the issuer of any of its underlying investments." In direct contravention of these restrictions, the Funds at various times allowed more than 20% of their assets to be invested in a single company (often the same ones whose "value" was being fraudulently manipulated) and repeatedly acquired controlling stakes in several of the companies in which they were invested, whose "valuation" they later grossly inflated.

55.    Monthly newsletters and other marketing materials sent by Citco NV and Lauer to investors were also replete with falsehoods about the Funds' holdings and performance.

**Participation of the Director Defendants**

56.    The PPMs represented that the Funds' Board of Directors would review the values assigned to the securities held by the Fund and, if the valuations did not fairly present those values, the Board would value the securities reasonably and set forth the valuations in writing.  The audited financial statements for 2001 (and the restated audited financial statements for 2000) state that "in accordance and in conformity with the Fund's Placement Memorandum, the Board of Directors in conjunction with the investment manager determine at what value the investment securities are reported for the determination of the net asset value of the Fund."

57.    The audited financial statements for 2001 (and the restated audited financial statements for 2000) state that the Board of Directors of the Offshore Fund determined the value of 100% of the Fund's securities.

58.    On information and belief, the Director Defendants failed to exercise independent judgment and appropriate care and attention with respect to the

determination of the Funds' NAV. They likewise knew or were reckless in not knowing that the Funds' holdings were overvalued and their NAV grossly inflated.

59.     The Director Defendants owed a fiduciary duty to the Funds and their shareholders to examine the valuation methodologies applied by Lauer in determining the NAV. The Director Defendants further owed a fiduciary duty to the Funds and their shareholders to reasonably determine substitute methodologies in the event that they determined that the valuation methodologies applied by Lauer did not result in reasonable and accurate market values. The Director Defendants failed to satisfy these fiduciary duties by allowing the materially false and misleading statements of the Funds' NAV to be disseminated to investors, including plaintiffs.

**Citco NV's Wrongful Conduct**

60.     At all relevant times until September 2002, Citco NV served as administrator to the Funds.

61.     Citco NV was to provide various administrative services to the Funds, including, inter alia: (a) preparing and maintaining all customary financial and accounting books and records; (b) disseminating the Funds' NAV information; (c) preparing, or causing to be prepared, and disseminating the annual financial statements of the Funds, as well as quarterly reports regarding the NAV of the Funds; and (d) performing all other accounting and clerical services necessary in connection with the administration of the Funds.

62.     According to Citco NV's marketing materials, Citco NV maintains "the accounting records of a fund on an independent basis" and prices the fund's portfolio "using recognized data vendors".

63.    Materials prepared by Citco NV and provided to certain investors in the Funds specifically stated that Citco NV has policies, procedures and safeguards in place to ensure that valuations would be done accurately and fairly.  These materials also stated that Citco NV "ensure[s] that we rely on third-party information on trades, portfolios and prices, and reconcile them to manager reports to ensure the independence of the valuation produced" and that Citco NV itself  prepares monthly NAV calculations for the Funds.

64.    During the relevant time period Citco NV assigned at least three of its officers, defendants Conroy, Stocks and Quilligan, to serve as Directors of the Funds.  Upon information and belief, the Citco Directors undertook the assignment in furtherance of their duties on behalf of Citco NV and to help Citco NV retain the Funds as clients.

65.    John M.S. Verhooren, a former director of Lancer Offshore and a Citco NV employee, writing for an industry publication in May 2003, stated that one of the guiding principles of a hedge fund administrator is to provide an honest interface between the investor and the fund.  According to Verhooren, an administrator's "raison d'etre"  is to serve the interests of the investors by providing them with the independent, accurate and timely information they need to make informed decisions about their investments.   He went on to note that 'pricing' is central to the role of a fund administrator and that "a good administrator will always have insisted on independent pricing, and will terminate a contract with a hedge fund if they cannot agree with its primary methodology."

66.    Similarly, Declan Quilligan, identified at the time as General Manager and Managing Director of Citco NV was quoted in a 2001 article on the role Citco NV provides as follows: "Independence combined with an accurate, timely and professional service is how we can 'add value' to the finished product and to our clients…. The shareholders are our ultimate client… and they rely on our experience and time in the industry – which is since the very beginning – and take confidence from our subsequent position as a market leader. Our involvement means they don't have to entirely rely on the investment manager." The article goes on to note that Citco NV's centralized funds department allows Citco NV's 30 staff personnel to provide shareholder services to Citco NV funds whether they are administered in Curacao, the United States or elsewhere. Quilligan cites such integration as important in providing client services.

67.    Each month, Citco NV distributed to each shareholder of the Funds a statement setting forth the NAVs of the Funds. Plaintiffs reasonably expected that Citco NV would accurately report the Funds' NAV. As described above, each of these statements was materially false. Citco NV failed to independently value the portfolios and instead slavishly adhered to the valuations provided by Lauer.

68.    Citco NV also sent to investors and shareholders periodic reports prepared by Lauer and/or Lancer Management, all of which contained materially false information about the Funds' NAVs, their holdings, and the performance of their portfolio companies.

69.    Through the intimate involvement of the Citco Directors in the affairs of the Funds, they (and Citco NV through them) had access to non-public

information concerning the Funds' financial affairs and business practices, including periodic internal reports detailing revenues, holdings and other financial information.

70.     Thus, the Citco Directors knew, or should have known, that the Funds' NAV's were materially inflated.  This knowledge must be imputed to Citco NV.

71.     Citco NV knew or was reckless in not knowing that the Funds' holdings were overvalued and that their performance and NAV's were grossly overinflated.  Citco NV likewise knew or was reckless in not knowing that the statements and information it provided to investors concerning the Funds' performance and NAVs were materially false and misleading.

72.     Citco NV resigned as administrator of the Offshore Fund in September 2002.  Upon information and belief, it knew, at that time, of significant irregularities in the conduct of the Funds, but failed to disclose those irregularities to shareholders and prospective investors, including plaintiffs.

**PWC NA's Wrongful Conduct**

73.     PWC NA knew that, at least beginning in October 1999, the Funds' PPMs identified "Pricewaterhouse Coopers" as the auditors and "Chartered Accountants" of the Funds.

74.     PWC NA audited Lancer Offshore's financial statements for the years ended December 31, 1997, 1998, 1999, 2000 and 2001.  Upon information and belief, PWC NA also audited Viator's financial statements for the fiscal year ended September 30, 2000 and the Orbiter's financial statements for the year(s) ended December 31, 1999 and/or 2000.

75.     PWC NA's opinion letters stated that it had conducted its audits in accordance with international auditing standards.  This refers to standards established

by the International Auditing and Assurance Standards Board, which functions as an

independent standard setting body under the auspices of the International Federation of

Accountants ("IFAC").  IFAC issues International Standards on Auditing ("ISA"), which

are similar to those issued by the American Institute of Certified Public Accountants and

the Public Company Accounting Oversight Board.

       76.    Each year, PWC NA issued a "clean" unqualified report attesting to

the accuracy of Lancer Offshore's financial statements.  These audit reports were

specifically addressed to the investors in the Funds and distributed to the investors

through Citco NV.

       77.    PWC NA's audit opinions for Lancer Offshore each year included

the following statement for the year under examination (with the audit opinions for the

year ended December 31, 2000 also representing that PWC NA had confirmed the

securities owned by correspondence with the custodian):

> We have audited the accompanying statement of assets and
> liabilities of [the Fund] as of December 31, .... and the
> related statement of operations, changes in shareholders'
> equity and cash flows for the year ended December 31, ....
> These financial statements are the responsibility of the
> Fund's management.  Our responsibility is to express an
> opinion on these financial statements based on our audit.
>
> We conducted our audit in accordance with international
> standards on auditing.  Those standards require that we plan
> and perform the audit to obtain reasonable assurance about
> whether the financial statements are free of material
> misstatement. An audit includes examining, on a test basis,
> evidence supporting the amounts and disclosures in the
> financial statements.  An audit also includes assessing the
> accounting principles used and significant estimates made
> by management, as well as evaluating the overall financial
> statement presentation. We believe that our audit provides a
> reasonable basis for our opinion.

78.     The audit opinions went on to state that:   "In our opinion the financial statements referred to above present fairly, in all material respects, the financial positions of [the Funds],   as of December 31, ... and the results of its operations, changes in shareholders' equity and cash flows for the year ended December 31, ... in conformity with international accounting standards."

79.     PWC NA's audit opinions for at least the years ended December 31, 2000 and December 31, 2001 falsely stated that the firm's audits of the Offshore Fund had been conducted in accordance with international standards on auditing.  Its representations were false because, upon information and belief, PWC NA did not plan and perform its audits to obtain reasonable assurances that the Funds' financial statements were free of material misstatements, and did not examine evidence supporting the valuation amounts and disclosures in the financial statements.  PWC NA's audits therefore did not "provide a reasonable basis for [its] opinion" and, by stating to the contrary, the opinions were entirely false.

80.     Upon information and belief, similar statements were contained in PWC NA's audit reports for the Viator and Orbiter Funds as well.

81.     PWC NA willfully, recklessly and/or grossly failed in its stated "responsibility to express an opinion on [the Funds'] financial statements based on our audit."  PWC NA misrepresented in its opinions that the Funds' financial statements were presented in accordance with international accounting standards, and that its audits were performed in accordance with international standards on auditing.

82.     ISA 200 requires an auditor to plan and perform an audit with an attitude of professional skepticism, which is necessary for the auditor to identify and

properly evaluate matters that increase the risk of material misstatements resulting from fraud or error (for example, management's characteristics and influence over the internal control environment, industry conditions, and operating characteristics and financial stability).  Thus, representations by management would ordinarily be expected to be supported by other evidence and would not be assumed to be necessarily correct.

83.    The Funds' claims of steadily increasing NAV's, in a declining market and when its portfolio consisted of small companies whose securities were thinly traded, should have met with skepticism on the part of PWC NA, but did not.  After the end of 1999, the global equity markets declined significantly and investors generally suffered negative returns for 2000, 2001 and 2002, but Lancer Offshore, according to Lauer and Lancer Management, earned approximately $100 million in each of 2000 and 2001.  PWC NA, which (unlike most of the Funds' investors) knew the companies in which the Funds were invested, should have been skeptical of these performance claims and should have employed procedures to verify those claims, but did not.

84.    Additionally, PWC NA should have recognized a variety of "red flags" raised by the information it was receiving including, but not limited to: (a) many of the companies whose shares were held by the Funds shared a common address in Boca Raton, Florida; (b) personnel associated with the Funds and/or Lancer Management had previously been barred by governmental agencies from working with public companies and brokers; and (c) Lauer himself reportedly poured millions of dollars into films being produced by Total Film, a company in which the Funds held large positions.

85.     PWC NA knew that the valuation of the Funds' portfolios were subject to a high degree of uncertainty.  The 2001 notes to the financial statements of Lancer Offshore, noted that:

> Due to the characteristics of certain investment securities of the Fund combined with limited trading volumes of such securities, the Board of Directors in conjunction with the investment manager estimated the fair values of such securities based on a methodology developed by the investment manager.   The total value of investment securities of the Fund which were subjected to such valuation procedures at year-end amounted to USD 827,020,243 which represents 100% of investment securities of the Fund.

86.     Knowing that the valuations of the Funds were dependent on judgments made by management and the Board of Directors, PWC NA was required to engage in such auditing procedures as were necessary to afford a reasonable opinion regarding the fairness of those valuations.   Had PWC NA conducted an audit appropriate for these circumstances, it would not have been able to issue an unqualified opinion on the Funds' financial statements.

87.     PWC NA should have added an explanatory paragraph to its standard reports to emphasize the uncertainty of the valuation of the market prices of the Funds' investments.   PWC NA also should have expressly stated that a large portion of the Funds' portfolio was subject to good faith valuation estimates by the Funds' Board of Directors in view of the absence of readily ascertainable market values.

88.     Because PWC NA accepted valuations for the Funds' portfolio companies that the SEC has subsequently described as "outlandish", PWC NA's audits of Lancer Offshore for at least 2000 (NAV of $840.22 per share) and 2001 (NAV of $915.43 per share) were materially false and misleading.

89.   On information and belief, the appraisals prepared for the Funds' holdings, which PWC NA accepted in rendering its opinion, closely approximated the values assigned to the Funds' holdings based on the manipulated closing prices at month end.  These appraisals were, however, fatally flawed and did not reflect the true values of the Funds' holdings under the generally accepted Uniform Standards of Professional Appraisal Practice or the American Society of Appraisers Business Valuation Standards.  In particular, the valuations were improperly based on unreliable market prices of thinly traded securities; unjustified prices of private transactions in thinly traded securities; unfounded, baseless and unrealistic projections; hypotheticals; and/or an averaging of various factors.  Indeed, under accepted standards of valuing businesses, certain of the Funds' holdings were and/or are essentially worthless.

90.   That PWC NA's audits of the value of the Funds' investments were fraudulent or recklessly negligent is illustrated by the facts relating to Lancer Offshore's investment in Biometrics (formerly AUG).  Upon information and belief, at some point in December 2001 Lancer Offshore acquired 18,000,000 shares of Biometrics for approximately $500,000, or less than 3 cents a share.  These shares were then valued at $61.2 million as of December 31, 2001, based on the fact that a mere 1,800 shares of Biometrics traded at $3.40 per share on December 31, 2001.  This $61.2 million valuation is almost 100 times the underlying value of the assets of Biometrics as disclosed by Biometrics' auditors as of December 31, 2002.

91.   On information and belief, Lancer Offshore delivered an appraisal of Biometrics to PWC NA to support the valuation that the Board of Directors assigned to the investment which did not comport with the generally accepted Uniform Standards

of Professional Appraisal Practice or the American Society of Appraisers Business Valuation Standards.

92.    Biometrics had no revenue for 2000 or 2001, had a negative cash flow from operations for the year ended December 31, 2001 of $281,593 and had total stockholder equity as of December 31, 2001 of $629,000, entirely in cash.    The company's financial statements as of September 30, 2001 indicated the the company had accumulated net losses from operations of $22,175,121 and that the company's ability to continue as a going concern was dependent on the ability to raise additional capital and implement its business plan.

93.    Notwithstanding the fact that Biometrics had no revenues, and that Biometrics had stated that it faced bankruptcy if it did not receive additional financing, its operating plan forecast revenues of tens of millions of dollars.

94.    PWC NA signed off on a "gain" of $60.7 million on Biometrics in the month of December 2001, notwithstanding (i) its knowledge of the pennies per share paid by Lancer Offshore for Biometrics earlier that month; (ii) the short interval between the acquisition of the bulk of the shares by Lancer Offshore versus the trade date utilized for valuation; (iii) the dramatic discrepancy between the price paid by Lancer Offshore for the bulk of its shares versus the price at which it "bought" at month end on the OTC market; and (iv) the patent lack of reliability of the appraisal, which disregarded Biometrics' own balance sheet that showed no asset value, and also disregarded Biometrics' auditor's qualified opinion questioning whether Biometrics would be able to continue as a going concern.

95.    Other companies in the Funds' portfolios were the subject of equally shoddy and useless valuations, which PWC NA, on even a rudimentary review, should have concluded were insufficient to support the valuations on which PWC NA was asked to sign off.

96.    The facts known at the time of PWC NA's audits of the Funds' investments should have heightened PWC NA's skepticism.  PWC NA knew that the bulk of the Funds' investments were purchased by the Fund for pennies per share in off-market transactions.  These penny stocks were written up by tens of millions of dollars just days or months later based on a "marking the close" scheme and were reflected in the financial statements as hundreds of millions of dollars of "unrealized gains."  The "unrealized gains" number was of particular significance in PWC NA's performance of the audit because those gains were a factor in determining both the Funds' NAV and Lancer Management's fee of 20% of the Funds' gains.

97.    Even a cursory examination by PWC NA of the portfolio company valuations that were provided to PWC NA would have revealed that the claimed values were totally unsupported by the facts, and the valuations were worthless.

98.    As PWC NA's opinion letters highlight, a central function of its audit was to "assess the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation."  This is precisely what PWC NA failed to do.

99.    Under ISA 24, transactions between entities that are "related parties" must be disclosed in the financial statements of the reporting entity.  PWC NA failed to cause the Funds to disclose the extensive related party transactions into which

Lauer and Lancer Management caused the Funds to engage.  Portfolio companies had common directors, Lancer Management and Lauer had relationships with those persons, and funds controlled by Lancer Management  were invested in some or all of the same securities that the Funds were invested.

100.    ISA 120, Section 19 also provides that, by contributing its name to the offering documents used by the Funds to promote the sale of their shares, PWC NA was attesting to the accuracy of the information contained in those documents.

101.    PWC NA failed, inter alia (i) to exercise due professional care in the performance of the audits and the preparation of the reports; (ii) to obtain a level of knowledge of the Funds' business that would enable PWC NA to plan and perform its audits in accordance with international auditing standards, including an understanding of the events, transactions, and practices that could have a significant effect on the financial statements; (iii) to properly study and evaluate the Funds' internal controls; (iv) to obtain sufficient, competent evidential material to provide it with a reasonable basis for forming an opinion in each of its audits of the Funds; and (v) to satisfy itself that the financial disclosures were adequate.

102.    PWC NA knew or should have known that its clean audit reports were material to investors' decisions to purchase shares in the Funds and to refrain from redeeming their investments.  Shares of the Funds were not publicly traded. Hence, no independently verified third-party financial information about the Funds or their performance was available to investors or prospective investors in the Funds other than PWC NA's audit report and the audited financial statements.

**B of A's Wrongful Conduct**

103.   B of A was the prime broker and the custodian for the Funds. Among other things, it held certain of the Funds' securities in custody.  Upon information and belief, at least through December 3, 2001, B of A held in custody for the Funds virtually all of the Funds' positions.

104.   Upon information and belief, B of A permitted Lauer, acting on behalf of the Funds, to regularly dial-in to its computer network and to enter the Funds' positions into an electronic database from which documents entitled "Bank of America Position Reports" ("B of A Position Reports") could be printed.

105.   Upon information and belief, Lauer also sent valuation information directly to B of A, sometimes by facsimile, and B of A employees entered this information directly into the B of A Position Reports, without verifying its accuracy.

106.   Once information was entered into the database, B of A Position Reports could be printed and/or downloaded.  In fact, such reports were printed out and provided to various third parties, including but not limited to Citco NV and PWC NA, who relied upon them for purposes of valuing and/or auditing the Funds.  The printed B of A Position Reports were captioned "Banc of America Securities, LLC; Client Position Summary by Asset Class."  These reports were also at times provided to investors and prospective investors, including The Pension Committee of the University of Montreal and Fondation Chagnon, who relied on the reports when making investment and retention decisions.

107.   B of A knew, or should have known, that Lauer, and/or those working on his behalf, would distribute the B of A Position Reports to third parties and/or that Lauer was using the B of A Position Reports for these purposes.  B of A also knew,

or should have known, that the hard copy printouts of the B of A Position Reports had its name emblazoned across the top of the report.

108.   B of A's actions substantially assisted Lauer in carrying out the fraudulent scheme described herein.  B of A's policy of allowing Lauer to gain direct access to its computer system and distribute B of A Position Reports to PWC NA and Citco NV helped Lauer to conceal the true value of the Funds' portfolio.

**IFS' Wrongful Conduct**

109.   In or about September 2002, IFS replaced Citco NV as Administrator of the Funds.

110.   IFS also distributed fraudulent NAV reports to plaintiffs for at least the months of October 2002, November 2002, December 2002.

111.   IFS did not perform an independent valuation of the Funds' NAV. Instead, IFS negligently relied on Lauer's fraudulent valuations.

**Reliance**

112.   Plaintiffs all reasonably relied upon the representations regarding the Funds' NAVs and other statements made in the NAV statements, audit reports, PPMs, performance reports and other communications from Lauer and the Funds' service providers in deciding to invest in and/or remain invested in the Funds. Alternatively, as the reported NAV, a figure that was solely within the control of the defendants, was the only measure by which shares in the Funds could be evaluated and purchased, plaintiffs are entitled to a presumption of reliance.

**The Funds' Collapse and Lawsuits**

113.   Following a series of negative news stories, beginning in the Fall of 2002, investors in the Funds began to make significant redemption requests, which the

Funds did not have the liquidity to satisfy.  Lawsuits by investors in Lancer Partners were commenced in the winter of 2003 seeking, among other things, Investors redemptions.

114.   On April 16, 2003, Lancer Partners filed for bankruptcy in the United States Bankruptcy Court for the District of Connecticut.

115.   On May 2, 2003 the Financial Services Commission ("FSC"), an enforcement agency of the British Virgin Islands roughly equivalent to the SEC, instituted an action in The Eastern Caribbean Supreme Court in the High Court of Justice in the Virgin Islands against Lancer Offshore and the OmniFund.  In that action the FSC seeks the appointment of a liquidator to wind up the Funds in an orderly fashion.  The FSC retained Deloitte & Touche to assist the FSC in reviewing the affairs and circumstances of the Funds.  In connection with that engagement, Deloitte & Touche prepared two substantive reports (the "Deloitte Reports"), which detail some of the fraudulent conduct engaged in by the Funds.

116.   On July 8, 2003 the Securities and Exchange Commission (the "SEC") commenced an action by filing a Complaint for Injunctive and Other Relief against  numerous individuals and entities involved with the Funds (the "*SEC* Action").  At the SEC's request, a receiver has been appointed for Lancer Management Group, LLC, Lancer Management Group II, LLC, Lancer Offshore, Inc., OmniFund, Ltd., LSPV, Inc. and LSPV, LLC and their subsidiaries, successors and assigns.

117.   Several investors have commenced individual and class actions entitled *AXA Alternative Advisers, Inc. et al. v. John W. Bendall, Jr., et al.*, No. 03-CV-6763 (S.D.N.Y.), *Bruhl v. PricewaterhouseCoopers International Ltd., et al.*, No. 03-CV-

6644 (S.D.N.Y.) and *Rotman v. John W. Bendall, Jr., et al.*, No. 03-23044-CV (S.D. Fla.).

118.   Unless otherwise noted, the foregoing allegations, except for allegations relating to the plaintiffs, are based upon information and belief, which belief is based upon an investigation conducted by counsel.  Allegations regarding the nature of the fraud at issue herein and the involvement of the defendants in that fraud are based primarily upon: a) the Funds' Offering Memoranda, marketing materials, monthly performance reports and other communications from Lauer to plaintiffs'; b) the PWC NA audit reports; c) monthly statements prepared by Citco NV and IFS; d) information provided by various confidential sources to the plaintiffs, directly or indirectly; e) articles published by the media; f) the complaint in the SEC Action; (g) the complaints in actions brought by other investors; h) the Deloitte Reports; and i) pleadings and other materials filed by the Receiver.

## FIRST CLAIM FOR RELIEF

### (Against the Director Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)

119.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

120.   This claim is brought against defendants Bendall and Geist on behalf of those plaintiffs who purchased all or some of their shares in the Funds after the date on which Bendal and Geist became directors of the Funds.  This claim is brought against the Citco Directors on behalf of those plaintiffs who purchased all or some of their shares in the Funds after March 2000 and at a time during which the Citco Directors served as a director for the fund in which such shares were purchased.

121.    Lauer represented to plaintiffs that:

a.      The majority of the stocks in which the Funds would invest would be traded on the New York Stock Exchange, the American Stock Exchange or in the over-the-counter-market in the United States of America;

b.      No more than 20% of the Funds' gross asset value would be invested in any one company;

c.      The Funds would not take legal or management control of any of the companies into which they invested.

122.    Each of these representations were false because from at least as early as December 2000:

a.      The Funds invested almost exclusively in stocks traded either in the over-the-counter-market or on the pink slips;

b.      The Funds, at various times, invested more than 20% of their assets in a single company;

c.      The Funds took controlling stakes in many of the companies into which they invested.

123.    The Director Defendants intentionally and recklessly authorized or permitted Lauer and Lancer Management to report materially false and misleading information to plaintiffs regarding the Funds' investments including, but not limited to, fraudulent NAVs.

124.    The Director Defendants knew or recklessly disregarded the fact that the false and misleading information about the Funds' investments would be included in the NAV statements, monthly newsletters and offering materials sent to the plaintiffs.  The Director Defendants further knew that plaintiffs would rely on this false and misleading information in making decisions on whether to purchase and retain shares in the Funds.

125.    The Director Defendants further knew and intended that the false information about the Funds' investments would be included in the Funds' audited

financial statements, and that such audited financial statements would be sent to plaintiffs. Once again, the Director Defendants knew that plaintiffs would rely on this false and misleading information in making decisions on whether to purchase and retain shares in the Funds.

126.   The plaintiffs relied upon these misstatements in making investment and retention decisions with respect to the shares of the Funds.  Plaintiffs would not have purchased the securities of the Funds at the prices they did, or at all, if they had known that the statements made and/or caused to be made by the Director Defendants were materially false and misleading and/or omitted to state material facts necessary in order to make the statements accurate.  Furthermore, had they known of such misstatements, the plaintiffs would have divested themselves of any securities they had purchased in the Funds.

127.   By virtue of the foregoing, the Director Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that they, directly or indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby they knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, participated in the fraudulent manipulation and engaged in acts and practices and a course of business that operated as a fraud and deceit upon plaintiffs in connection with their purchase of shares of the Fund.

128.    The misrepresentations were made in connection with the purchase by plaintiffs of shares in the Funds and to induce them to purchase and retain such shares.  Plaintiffs were thereby damaged as a result.

129.    By reason of the foregoing, the plaintiffs are entitled to a judgment against the Director Defendants awarding the plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SECOND CLAIM FOR RELIEF

### (Against the Director Defendants for Common Law Fraud)

130.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

131.    As set forth more fully above, the Director Defendants knowingly and/or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding the management, performance and value of the Funds to plaintiffs.

132.    The Director Defendants, in the PPMs and other offering material, made fraudulent statements concerning the types of investments the Funds would make and the manner in which holdings would be valued, falsely representing that the Funds' assets would be valued using appropriate and reasonable methodology.  The Director Defendants also allowed repeated false and fraudulent statements concerning the Funds' performance to be disseminated to investors.

133.    Each of these defendants knew, or was reckless in not knowing, that their conduct constituted a fraud on the plaintiffs and would result in, and did in fact

result in, the purchase of Fund shares by the plaintiffs at inflated prices, the retention of such shares and the subsequent loss of a substantial portion of plaintiffs' investments.

134.   These defendants made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing the plaintiffs to purchase and retain securities in reliance thereon.

135.   Plaintiffs reasonably and justifiably relied on Lauer's misrepresentations and omissions in deciding to purchase and/or retain shares in the Funds.

136.   Each of the plaintiffs has been damaged by these defendants' wrongful conduct in that the defendants' wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and/or to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

137.   The fraudulent conduct of these defendants, as outlined above, was done purposefully, maliciously, recklessly and without regard for the rights and interests of the plaintiffs.

138.   By reason of the foregoing, the plaintiffs are entitled to a judgment against the Director Defendants, jointly and severally, awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## THIRD CLAIM FOR RELIEF

### (Against the Director Defendants for Breach of Fiduciary Duty)

139.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

140.   The Director Defendants owed the highest obligations and fiduciary duties to the plaintiffs, who are shareholders of the Funds.  These defendants were duty bound to act in a responsible and lawful manner, in utmost good faith, and in accordance with the representations on which the plaintiffs relied in entrusting their monies to these defendants, so as not to cause injury to the plaintiffs.

141.   These defendants each owed directly to each of the plaintiffs, as shareholder of the Funds, the duty to exercise due care and diligence in the management and administration of the Funds and in the use and preservation of the plaintiffs' property and assets.   These defendants also each owed directly to the plaintiffs the duties of full and candid disclosure of all material facts relevant to the Funds and duties to deal fairly and honestly with the plaintiffs.  These defendants were obligated to ensure that Lauer and Lancer Management did not engage in any fraudulent, unsafe or unsound valuation practices.

142.   In engaging in the conduct alleged herein, including, but not limited to, falsely reporting values of the plaintiffs' investments, these defendants repeatedly breached their fiduciary and related obligations to the plaintiffs.

143.   Each of the plaintiffs has been damaged by the wrongful conduct of these defendants in that the plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor

50

redemption requests, causing each plaintiff to lose a substantial portion of its investment.

144.   The conduct of these defendants was purposeful and it departed in the extreme from the norms expected of such persons.   Lauer and the Director Defendants cavalierly disregarded their duties to, and the interests of, the plaintiffs.

145.   By reason of the foregoing, the plaintiffs are entitled to a judgment against these defendants, jointly and severally, awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### FOURTH CLAIM FOR RELIEF

**(Against the Director Defendants
for Negligence and Negligent Misrepresentation)**

146.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

147.   Each of the Director Defendants had a duty to the plaintiffs to accurately value the Funds' portfolios.

148.   Even if there was no intent to defraud, the Director Defendants also acted negligently and carelessly in reporting to investors artificially inflated values for the portfolio.   The Director Defendants acted negligently and carelessly by permitting these artificially inflated portfolio valuations to be reported to investors and potential investors.

149.   The Director Defendants made the material misrepresentations and omissions alleged above with the intention of inducing plaintiffs to purchase and retain their investments in reliance thereon.

150.    Plaintiffs reasonably and justifiably relied on these defendants' misrepresentations and omissions, and the false information supplied by these defendants, in both purchasing and retaining securities.  Plaintiffs also reasonably relied on the Director Defendants to oversee the Funds and manage and/or value the portfolios competently and in keeping with their representations.

151.    Plaintiffs were damaged by these defendants' negligent and/or grossly negligent conduct.  Plaintiffs would not have purchased their shares in the Funds and/or would have divested them sooner had they known that these defendants had engaged in the negligent and/or grossly negligent conduct alleged herein.

152.    By reason of the foregoing, the plaintiffs are entitled to a judgment against the Director Defendants, jointly and severally, awarding the plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FIFTH CLAIM FOR RELIEF

### (Against Director Defendants for Aiding and Abetting Common Law Fraud)

153.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

154.    The Director Defendants played a significant and vital role in the fraudulent scheme alleged herein, with knowledge or reckless disregard thereof.

155.    The Director Defendants knew or should have known that the information being disseminated by Lauer was fraudulent and that such information would be relied upon by investors.

156.   Instead, the Director Defendants knowingly or recklessly failed in their role.  The Director Defendants knowingly and substantially aided and abetted the fraud committed by allowing Lauer to disseminate the fraudulent monthly statements and performance reports, failing to verify that the NAV's were consistent with market value, failing to conduct any independent valuation of the Funds' portfolios and/or participating in the fraudulent valuations.

157.   The conduct of the Director Defendants proximately caused significant damage to the plaintiffs.  The fraud could not have succeeded without the active and knowing participation of the Director Defendants.

158.   Each of the plaintiffs has been damaged by the wrongful conduct of the Director Defendants in that the plaintiffs were induced to purchase and/or hold shares of the Funds at inflated values, and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

159.   The Director Defendants' conduct was purposeful and malicious, or reckless, and departed in the extreme from the norms expected of fund directors.  The Director Defendants cavalierly disregarded their duties to, and the interests of, the plaintiffs.

160.   By reason of the foregoing, plaintiffs are entitled to a judgment against the Director Defendants, jointly and severally, awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SIXTH CLAIM FOR RELIEF

### (Against The Director Defendants for Aiding and Abetting
### Breach of Fiduciary Duty)

161.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

162.   The Director Defendants knew or recklessly disregarded the fact that Lauer owed fiduciary and other obligations to the plaintiffs, and knew or recklessly disregarded the fact that Lauer was breaching said obligations by engaging in the conduct alleged herein.

163.   With such knowledge, the Director Defendants knowingly participated, aided and abetted, and otherwise conspired to bring about Lauer's breaches of fiduciary obligations by, inter alia, allowing Lauer to disseminate the fraudulent NAV and performance information, failing to verify that the NAV's were consistent with market value, failing to conduct any independent valuation or assessment of the Funds' portfolios and/or participating in the fraudulent valuations.

164.   Based on the information that they had, the Director Defendants knew or should have known that Lauer was breaching his fiduciary duties to plaintiffs in this manner.

165.   Each of the plaintiffs has been damaged by the wrongful conduct of the Director Defendants in that the wrongful conduct caused each plaintiff to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

166.   The Director Defendants' wrongful conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the plaintiffs.

167.   By reason of the foregoing, the plaintiffs are entitled to a judgment against the Director Defendants, jointly and severally, awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SEVENTH CLAIM FOR RELIEF

### (Against Citco NV for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)

168.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

169.   This claim is brought on behalf of only those plaintiffs who purchased all or part of their shares in the Funds after March 2000.

170.   Citco NV disseminated materially false and misleading NAV statements and performance information to plaintiffs.  Citco misrepresented that it would follow the policies and procedures that it had in place to ensure the accurate valuation of the Funds' NAV.

171.   Citco NV also furnished materially false and misleading financial information regarding the Funds to PWC NA and distributed false and misleading financial statements and audit reports for the Funds and PWC NA to investors, including plaintiffs.

172.   Citco NV possessed, or had access to, information about the Funds' positions which revealed that the portfolios were not being properly valued.

Among other things, defendants Conroy, Stocks and Quilligan were directors of the Funds and as directors knew, or should have known, that the valuations provided by Lauer and Lancer Management to Citco NV were false. Their knowledge must be imputed to Citco NV.

173. Moreover, Citco NV knew or recklessly disregarded that investors, including plaintiffs, would rely upon the materially false and misleading financial statements and audit reports for the Funds that it distributed in deciding to invest in and remain invested in the Funds.

174. The plaintiffs relied upon these misstatements in deciding to purchase shares of the Funds. Plaintiffs would not have purchased the securities of the Funds if they had known that the materials being distributed by Citco NV, including statements made and/or caused to be made by the Director Defendants and the audit reports and financial statements, were materially false and misleading and/or omitted to state material facts necessary in order to make the statements accurate. Furthermore, had they known of such misstatements, the plaintiffs would have divested themselves of any securities they had purchased in the Funds.

175. By virtue of the foregoing, Citco NV violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that it, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to

speak, and engaged in acts of fraud and deceit upon the plaintiffs, all in connection with the purchase or sale of a security.

176.   Each of the plaintiffs has been damaged by Citco NV's wrongful conduct in that such wrongful conduct caused each of them to purchase and hold shares in the Funds at inflated values and/or to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

177.   By reason of the foregoing, the plaintiffs are entitled to judgment against Citco NV awarding the plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## EIGHTH CLAIM FOR RELIEF

### (Against The Citco Group for
### Violations of Securities Exchange Act § 20(a))

178.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

179.   This claim is brought on behalf of those investors who purchased all or part of their shares in the Funds after March 2000.

180.   As alleged more fully above, Citco NV's conduct violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

181.   At all relevant times, The Citco Group had the power, both direct and indirect, to control Citco NV, which was a division of The Citco Group, did in fact exercise such control and was therefore controlling a person within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

182.    Each of the plaintiffs has been damaged by the wrongful conduct of The Citco Group through its control of Citco NV, in that the wrongful conduct caused each of the plaintiffs to purchase shares in the Funds at inflated values and to remain invested in the Funds.

183.    By reason of the foregoing, the plaintiffs are entitled to a judgment against The Citco Group awarding the plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## NINTH CLAIM FOR RELIEF

### (Against Citco NV for Common Law Fraud)

184.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

185.    As set forth more fully above, Citco NV knowingly and/or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding the management, performance and value of the Funds to plaintiffs.

186.    Citco NV repeatedly disseminated fraudulent and grossly inflated NAV statements to the Funds' investors.   Citco NV also disseminated numerous newsletters and performance reports generated by Lauer and audit reports of PWC NA that contained material misrepresentations about the Funds' performance.   Citco NV also misrepresented that it would follow the policies and procedures that it had in place to ensure the accurate calculation of the Funds' NAVs.

187.    Citco NV knew, or was reckless in not knowing, that its conduct constituted a fraud on the plaintiffs and would result in, and did in fact result in, the

purchase of Fund shares by the plaintiffs at inflated prices and/or the retention of such shares, all resulting in the subsequent loss of a substantial portion of plaintiffs' investments.

188. Citco NV made the material misrepresentations, and omitted to disclose the material facts, herein alleged with the intention of inducing the plaintiffs to purchase and retain securities in reliance thereon.

189. Plaintiffs reasonably and justifiably relied on Citco NV's misrepresentations and omissions in deciding to purchase and/or retain shares in the Funds.

190. Each of the plaintiffs has been damaged by Citco NV's wrongful conduct in that such wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

191. The fraudulent conduct of Citco NV, as outlined above, was done purposefully, maliciously, recklessly and without regard for the rights and interests of the plaintiffs.

192. By reason of the foregoing, the plaintiffs are entitled to a judgment against Citco NV, awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### TENTH CLAIM FOR RELIEF

### (Against Citco NV and IFS for Breach of Fiduciary Duty)

193.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

194.    Citco NV and IFS, as administrators of the Funds, owed the highest obligations and fiduciary duties to the plaintiffs, who are shareholders of the Funds. These defendants were duty bound to act in a responsible and lawful manner, in utmost good faith, and in accordance with the representations on which the plaintiffs relied in entrusting their monies to these defendants, so as not to cause injury to the plaintiffs.

195.    These defendants each owed directly to each of the plaintiffs, as shareholders of the Funds, the duty to exercise due care and diligence in the management and administration of the Funds, in the use and preservation of the plaintiffs' property and assets and in ensuring the accuracy of information transmitted to investors concerning the holdings and valuation of the Funds' assets.    These defendants also each owed directly to the plaintiffs the duties of full and candid disclosure of all material facts relevant to the Funds and duties to deal fairly and honestly with the plaintiffs.  These defendants were obligated to ensure that Lauer and Lancer Management did not engage in any fraudulent, unsafe or unsound valuation practices.

196.    In engaging in the conduct alleged herein, including, but not limited to, falsely reporting prices and results of the plaintiffs' investments, and by failing to report that Lauer was fraudulently overstating the value of the Funds' portfolios and otherwise disregarding the representations made in the PPMs, these defendants repeatedly breached their fiduciary and related obligations to the plaintiffs.

197.    Each of the plaintiffs has been damaged by the wrongful conduct of these defendants in that the plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

198.    The conduct of these defendants was purposeful and it departed in the extreme from the norms expected of such persons.  Citco NV and IFS cavalierly disregarded their duties to, and the interests of, the plaintiffs.  By reason of the foregoing, the plaintiffs are entitled to a judgment against these defendants, jointly and severally, awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### ELEVENTH CLAIM FOR RELIEF

### (Against Citco NV for Aiding and Abetting Common Law Fraud)

199.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

200.    Defendant Citco NV played a significant and vital role in the fraudulent scheme alleged herein, with knowledge or reckless disregard thereof.

201.    Citco NV knew or should have known that investors would rely on the NAV statements and newsletters that it was disseminating as a basis for investing in and/or maintaining their investments in the Funds.  Plaintiffs derived great comfort from representations that Citco NV would independently calculate the Funds' NAV.

202.    Instead, Citco NV knowingly or recklessly failed in its role.  Citco NV knowingly and substantially aided and abetted the fraud committed by Lauer and the

Director Defendants by using the NAV's provided by Lauer without verifying that the NAV's were consistent with market value, failing to conduct any independent valuation of the Funds' portfolios, and disseminating monthly statements to plaintiffs that contained false and overstated NAVs.

203.    The conduct of Citco NV proximately caused significant damage to the plaintiffs.  The fraud could not have succeeded without the active and knowing participation of Citco NV.

204.    Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV in that the plaintiffs were induced to purchase and/or hold shares of the Funds at inflated values, and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

205.    Citco NV's conduct was purposeful and malicious, or reckless, and departed in the extreme from the norms expected of an administrator.  Citco NV cavalierly disregarded its duties to, and the interests of, the plaintiffs.

206.    By reason of the foregoing, plaintiffs are entitled to a judgment against Citco NV awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## TWELFTH CLAIM FOR RELIEF

### (Against Citco NV for Aiding and Abetting Breach of Fiduciary Duty)

207.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

208.  Citco NV knew or recklessly disregarded the fact that Lauer and the Director Defendants owed fiduciary and other obligations to the plaintiffs, and knew or recklessly disregarded the fact that these defendants were breaching said obligations by engaging in the conduct alleged herein.

209.  With such knowledge, Citco NV knowingly participated, aided and abetted, and otherwise conspired to bring about these defendants' breaches of fiduciary obligations by, inter alia, using the NAV's provided to them by Lauer without verifying that the NAV's were consistent with market value, failing to conduct any independent valuation or assessment of the Funds' portfolios, and disseminating monthly statements to plaintiffs that contained false and overstated NAVs.

210.  Based on the information that it had, Citco NV knew or should have known that these defendants were breaching their fiduciary duties to plaintiffs by disseminating false and overstated NAVs to plaintiffs.

211.  Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV in that the wrongful conduct caused each plaintiff to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

212.  Citco NV's wrongful conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the plaintiffs.

213.  By reason of the foregoing, the plaintiffs are entitled to a judgment against Citco NV awarding the plaintiffs compensatory and punitive damages in an

amount to be determined at the trial of this action, together with interest at the statutory rate.

## THIRTEENTH CLAIM FOR RELIEF

### (Against Citco NV for Negligence, Negligent Misrepresentation and Professional Malpractice)

214.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

215.   Citco NV had a duty to the plaintiffs to independently calculate and verify the NAVs each month, to verify that the NAV's used by Lauer reflected market value and to send accurate NAV statements to plaintiffs.

216.   Citco NV performed its duties negligently and/or grossly negligently, and in reckless disregard of its duties, thereby enabling Lauer and the Director Defendants to perpetrate and continue their fraudulent scheme.   Citco NV failed to independently value the NAVs of the Funds and to ensure the accuracy of the values supplied by the Lauer.   Instead, Citco NV used valuation information provided by Lauer, including the B of A Position Reports, to calculate and send false NAV statements to plaintiffs.   Citco NV then disseminated this false and fraudulent information directly to the plaintiffs.

217.   Citco NV knew, or reasonably should have known, that the plaintiffs would rely upon this information in purchasing their shares or, with respect to existing investors, that those investors would rely upon this information in determining not to redeem their shares and/or to purchase new and additional shares in the Funds.

218.   Citco NV did not utilize the requisite skill and knowledge to perform its duties as administrator, woefully failed to exercise ordinary and reasonable care in

the application of its professional knowledge and skill, and woefully failed to use its best professional judgment in the application of its knowledge and skill.

219.   In the course of this conduct, Citco NV failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated.  Citco NV demonstrated a complete disregard for the rights of the plaintiffs, as well as for the security of their investments.

220.   Plaintiffs were damaged by Citco NV's negligence.  Plaintiffs would not have purchased and/or maintained their shares in the Funds had they known that Citco NV had engaged in the negligent conduct alleged herein.

221.   Each of the plaintiffs has been damaged by the wrongful conduct of Citco NV in that the plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, which caused each plaintiff to lose a substantial portion of its investment.

222.   By reason of the foregoing, the plaintiffs are entitled to a judgment against Citco NV awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### FOURTEENTH CLAIM FOR RELIEF

#### (Against PWC NA for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)

223.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

224.   This claim is brought on behalf of those plaintiffs who purchased all or part of their shares in the Funds after March 2000.

225.    The audit reports that were issued by PWC NA to Plaintiffs were materially false and misleading in that they falsely represented that the audits of the Funds' financial statements were conducted "in accordance with international standards on auditing."  PWC NA's representation and commitment was false and misleading in that PWC NA did not conduct its audits of the Funds in the manner represented. Moreover, it did not establish reasonable procedures to confirm the values presented in the Funds financial statements as it claimed to have done.

226.    The audit reports issued by PWC NA were also materially false and misleading in that they falsely represented that the Funds' financial statements "[p]resented fairly, in all material respects the financial positions of [the Funds] … in conformity with international accounting standards."  In fact, as PWC NA knowingly or recklessly disregarded, the Funds' financial statements materially overstated the financial position, performance and net assets of the Funds and had not been prepared in accordance with international accounting standards.

227.    PWC NA knew or recklessly disregarded the fact that its audit reports would be a principal means by which investors would be induced to purchase shares of the Funds, in that there was no other purportedly independently verified information available to investors upon which they could rely to value the assets of the Funds.  PWC NA further knew that plaintiffs would rely on this false and misleading information in making decisions on whether to purchase and retain shares in the Funds.

228.    The plaintiffs relied upon these misstatements in making investment and retention decisions with respect to the shares of the Funds.  Plaintiffs would not have purchased the securities of the Funds at the prices they did, or at all, if

they had known that the statements made and/or caused to be made by PWC NA were materially false and misleading and/or omitted to state material facts necessary in order to make the statements accurate.  Furthermore, had they known of such misstatements, the plaintiffs would have divested themselves of any securities they had purchased in the Funds.

229.   By virtue of the foregoing, PWC NA violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that it, directly or indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby it knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, participated in fraudulent manipulation and engaged in acts and practices and a course of business that operated as a fraud and deceit upon plaintiffs in connection with their purchase of shares of the Fund.

230.   Each of the plaintiffs has been damaged by PWC NA's wrongful conduct in that such wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

231.   By reason of the foregoing, the plaintiffs are entitled to judgment against PWC NA awarding the plaintiffs compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## FIFTEENTH CLAIM FOR RELIEF

### (Against PWC NA for Common Law Fraud)

232.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

233.   As set forth more fully above, PWC NA knowingly and/or recklessly issued materially false and misleading audit reports, specifically addressing such audit reports to the investors in the Funds, including plaintiffs.

234.   PWC NA materially misrepresented to the plaintiffs that it had conducted audits in accordance with international standards on auditing, and that it had a reasonable basis for expressing its opinion that the Funds' financial statements were fairly presented in accordance with international accounting standards.  Neither of these statements was correct.  In fact, PWC NA had not conducted any meaningful audit in accordance with international standards on auditing, and PWC NA had no reasonable basis upon which to express an opinion on the Funds' financial statements.

235.   Moreover, as detailed above, the audit reports issued by PWC NA were materially false and misleading in that they falsely represented that the Funds' financial statements "presented fairly, in all material respects, the financial positions" of the Funds.  In fact, as PWC NA knowingly or recklessly failed to know, the Funds' financial statements materially overstated the Funds' NAV.

236.   PWC NA knew that investors would rely upon the fact that it had audited the Funds' financial statements in deciding to invest in the Funds, and in deciding not to redeem their shares.  PWC NA's audit opinions gave investors, including plaintiffs, a false sense of security in the historical performance of the Funds and

provided investors with assurance that the returns being reported by the Funds had been independently verified by a "Big Four" accounting firm.   PWC NA's misrepresentations in its audit opinions concerning the adequacy of its audits and the basis for its opinions were material.

237.   Plaintiffs relied on PWC NA's misrepresentations in deciding to purchase shares in the Funds, to increase their investments in the Funds and/or not to redeem the shares they held.  Given that there was no other purportedly independent verification of the Funds' financial information, PWC NA knew or recklessly disregarded that the audit reports it issued would be a principal means by which investors would be induced to purchase shares of the Funds, to increase their shares in the Funds and/or to retain their existing shares.  PWC NA was under an affirmative duty to obtain competent evidentiary material verifying the assets held by the Funds, as well as the true value of such assets, yet it failed to do so.

238.   Each of the plaintiffs has been damaged by PWC NA's wrongful conduct in that such wrongful conduct caused each of them to purchase and/or hold shares in the Funds at inflated values and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

239.   The fraudulent conduct of PWC NA, as outlined above, was done purposefully, maliciously, recklessly and without regard for the rights and interests of the plaintiffs.

240.   By reason of the foregoing, the plaintiffs are entitled to a judgment against PWC NA, awarding the plaintiffs compensatory and punitive damages in an

amount to be determined at the trial of this action, together with interest at the statutory rate.

**SIXTEENTH CLAIM FOR RELIEF**

**(Against PWC NA for Aiding and Abetting Common Law Fraud)**

241.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

242.   Defendant PWC NA played a significant and vital role in the fraudulent scheme alleged herein, with knowledge or reckless disregard thereof.

243.   PWC NA knowingly and substantially aided and abetted the fraud committed by Lauer and the Director Defendants by providing the Funds with clean audit opinions purportedly performed in accordance with the acceptable international accounting procedures.

244.   Plaintiffs derived great comfort from PWC NA's participation in the business of the Funds, particularly  PWC NA's consistently clean audit opinions.

245.   PWC NA knowingly or recklessly failed in its role as auditor of the Funds.  PWC NA knew or should have known that the Funds' NAV that it was "auditing" was grossly over-inflated.

246.   The conduct of PWC NA proximately caused significant damage to the plaintiffs.   The fraud could not have succeeded without the active and knowing participation of PWC NA.

247.   Each of the plaintiffs has been damaged by the wrongful conduct of PWC NA in that the plaintiffs were induced to purchase and/or hold shares of the Funds at inflated values, and to retain those shares until such time as the Funds were unable

to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

248.   PWC NA's conduct was purposeful and malicious, or reckless, and departed in the extreme from the norms expected of an auditor.  PWC NA cavalierly disregarded its duties to, and the interests of, the plaintiffs.

249.   By reason of the foregoing, plaintiffs are entitled to a judgment against PWC NA awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## SEVENTEENTH CLAIM FOR RELIEF

### (Against PWC NA for Aiding and Abetting Breach of Fiduciary Duty)

250.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

251.   PWC NA knew or recklessly disregarded the fact that Lauer and the Director Defendants all owed fiduciary and other obligations to the plaintiffs, and knew or recklessly disregarded the fact that these Defendants were breaching said obligations by engaging in the conduct alleged herein.

252.   With such knowledge, PWC NA knowingly participated, aided and abetted, and otherwise conspired to bring about Lauer and the Director Defendants' breaches of fiduciary obligations by, inter alia, issuing "clean" audit opinions in 2000 and 2001.

253.   Each of the plaintiffs has been damaged by the wrongful conduct of PWC NA in that the wrongful conduct caused each plaintiff to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor

redemption requests, causing each plaintiff to lose a substantial portion of its investment.

254.   PWC NA's wrongful conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the plaintiffs.

255.   By reason of the foregoing, the plaintiffs are entitled to a judgment against PWC NA awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## EIGHTEENTH CLAIM FOR RELIEF

### (Against PWC NA for Negligence, Negligent Misrepresentation and Professional Malpractice)

256.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

257.   PWC NA had a duty to the plaintiffs to independently audit the books and records of the Funds.  The audits prepared by PWC NA were specifically addressed and distributed to the investors in the Funds.

258.   PWC NA performed its duties negligently and/or grossly negligently, thereby enabling Lauer and the Director Defendants to perpetrate and continue their fraudulent scheme.  PWC NA failed to properly audit the financial records of the Funds and to ensure the accuracy of the NAV values supplied by Lauer.

259.   PWC NA knew, or reasonably should have known, that the plaintiffs would rely upon its audits in purchasing their shares or, with respect to existing

plaintiffs, that those plaintiffs would rely upon this information in determining not to redeem their shares and to purchase new and additional shares in the Funds.

260.   PWC NA did not utilize the requisite skill and knowledge to perform its duties as auditor, woefully failed to exercise ordinary and reasonable care in the application of its professional knowledge and skill, and woefully failed to use its best professional judgment in the application of its knowledge and skill.

261.   In the course of this conduct, PWC NA failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated. PWC NA demonstrated a complete disregard for the rights of the plaintiffs, as well as for the security of their investments.

262.   PWC NA failed to perform duties with the due and professional care required of an experienced auditor of hedge funds such as Lancer Offshore and OmniFund.

263.   Plaintiffs were damaged by PWC NA's negligence. Plaintiffs would not have purchased or maintained their shares in the Funds had they known that PWC NA had engaged in the negligent conduct alleged herein.

264.   Each of the plaintiffs has been damaged by the wrongful conduct of PWC NA in that the plaintiffs were induced to purchase and/or hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, which caused each plaintiff to lose a substantial portion of its investment.

265.   By reason of the foregoing, the plaintiffs are entitled to a judgment against PWC NA awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## NINETEENTH CLAIM FOR RELIEF

### (Against B of A for Aiding and Abetting Common Law Fraud)

266.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

267.   Defendant B of A played a significant and vital role in the fraudulent scheme alleged herein, with knowledge or reckless disregard thereof.

268.   B of A knowingly and substantially aided and abetted the fraud committed by Lauer and the Director Defendants by allowing Lauer to create false position reports from B of A's computer system which were then given to PWC NA and Citco NV by Lauer as part of the preparation of fraudulent audit reports and monthly NAV statements.  Upon information and belief, B of A knew that Lauer was generating these B of A Position Reports and providing them to the auditor, administrator and certain investors.

269.   The conduct of B of A proximately caused significant damage to the plaintiffs.   The fraud could not have succeeded without the active and knowing participation of B of A.

270.   Each of the plaintiffs has been damaged by the wrongful conduct of B of A in that the plaintiffs were induced to purchase and/or hold shares of the Funds at the inflated values set forth in the monthly NAV statements, audit reports and/or B of A Position Reports, and to retain those shares until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment in the Funds.

271.   B of A's conduct was purposeful and malicious, or reckless, and departed in the extreme from the norms expected of a prime broker and custodian. B of A cavalierly disregarded its duties to, and the interests of, the plaintiffs.

272.   By reason of the foregoing, plaintiffs are entitled to a judgment against B of A awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

### TWENTIETH CLAIM FOR RELIEF

**(Against B of A for Aiding and Abetting Breach of Fiduciary Duty)**

273.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

274.   B of A knew or recklessly disregarded the fact that Lauer and the Director Defendants owed fiduciary and other obligations to the plaintiffs, and recklessly disregarded the fact that Lauer and the Director Defendants were breaching said obligations by engaging in the conduct alleged herein.

275.   With such knowledge, B of A knowingly participated, aided and abetted, and otherwise conspired to bring about Lauer and the Director Defendants' breaches of fiduciary obligations by, inter alia, allowing Lauer to create and forward to the auditor and administrator false position reports from B of A's computer system which were then used by PWC NA and Citco NV to prepare fraudulent audit reports and monthly NAV statements.  These B of A Position Reports were also provided, at times, to certain investors who relied upon such reports in making investment and retention decisions. Upon information and belief, B of A knew that Lauer was generating these B of A Position Reports and providing them to the auditor, administrator and/or certain investors.

276.    The conduct of B of A proximately caused significant damage to the plaintiffs.  The breaches of fiduciary duty could not have occurred undetected without the active and knowing participation of B of A.

277.    Each of the plaintiffs has been damaged by the wrongful conduct of B of A in that the wrongful conduct caused each plaintiff to purchase and/or hold shares in the Funds at inflated values set forth in the monthly NAV statements and audit reports until such time as the Funds were unable to honor redemption requests, causing each plaintiff to lose a substantial portion of its investment.

278.    B of A's wrongful conduct, as alleged herein, was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the plaintiffs.

279.    By reason of the foregoing, the plaintiffs are entitled to a judgment against B of A awarding the plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Against IFS for Negligence and Professional Malpractice)

280.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

281.    IFS had a duty to the plaintiffs to independently calculate and verify the NAVs each month, to verify that the NAVs used by Lauer reflected market value and to send accurate NAV statements to plaintiffs.  IFS sent fraudulent NAV statements directly to the plaintiffs.

282.   IFS performed its duties negligently, thereby enabling Lauer to perpetrate and continue his fraudulent scheme.  IFS failed to independently confirm or assess the NAVs of the Funds and to ensure the accuracy of the values supplied by Lauer.  IFS simply used Lauer's valuations to calculate and send false NAV statements to plaintiffs.

283.   IFS did not utilize the requisite skill and knowledge to perform its duties as administrator, woefully failed to exercise ordinary and reasonable care in the application of its professional knowledge and skill, and woefully failed to use its best professional judgment in the application of its knowledge and skill.

284.   In the course of this conduct, IFS failed to inquire into many crucial facts, which, in the exercise of ordinary care, it should not have ignored and should have investigated.   IFS demonstrated a complete disregard for the rights of the plaintiffs, as well as for the security of their investments.

285.   Plaintiffs were damaged by IFS' negligence.   Plaintiffs would not have maintained their shares in the Funds had they known that IFS had engaged in the negligent conduct alleged herein.

286.   Each of the plaintiffs has been damaged by the wrongful conduct of IFS in that the plaintiffs were induced to hold shares in the Funds at inflated values until such time as the Funds were unable to honor redemption requests, which caused each plaintiff to lose a substantial portion of its investment.

287.   By reason of the foregoing, the plaintiffs are entitled to a judgment against IFS awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## CONCLUSION

WHEREFORE, plaintiffs demand judgment from this Court awarding:

(1)    Compensatory damages to all plaintiffs against the defendants, jointly and severally, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by these plaintiffs for their interests in Lancer Offshore and OmniFund;

(2)    On Counts 2, 3, 9, 10, 11, 12, 15, 16, 17, 19 and 20, punitive damages in an amount to be determined at the trial of this action.

(3)    Interest on any award at the appropriate statutory or other rate; and.

(4)     Such other and further relief as this Court deems just and proper to adequately compensate plaintiffs.

Plaintiffs further demand a trial by jury of all claims set forth in this Complaint.

Dated:    Miami, Florida
          February 12, 2004

                                        Genovese Joblove & Battista, P. A.

                                        By: _____
                                              David C. Cimo, Esq.  # 775400
                                        36th Floor
                                        100 S.E. 2nd Street
                                        Miami, Florida  33131
                                        305-349-2300
                                        305-349-2310 (fax)

                                              -AND-

                                        BROWN RUDNICK BERLACK ISRAELS LLP

                                        Scott M. Berman (SB-4023)*
                                              120 West 45th Street
                                              New York, New York 10036
                                              (212) 704-0100

                                        Gregory T. Arnold (GA-2147)*
                                        Travis Corder (TC-7552)*
                                              One Financial Center
                                              Boston, Massachusetts 02111
                                              (617) 856-8200

                                        Attorneys for the Plaintiffs

                                        *Not admitted to practice in Florida

#1253662 v\3 - arnoldgt - qvby03!.doc   - 24027/1

JS44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| The Pension Committee of the University of Montreal Pension Plan; The Altar Fund; Aberdeen Investments, Ltd.; Aries Trading Ltd.; The Arrowsmith Fund, Ltd.; AXA Alternative Advisors, Inc.; Bank of Bermuda (Luxembourg) S.A.; Banque Privee Edmond de Rothschild Europe; et al. | Banc of America Securities, LLC ; Citco Fund Services (Curacao) N.V.; The Citco Group Limited; International Fund Services (Ireland) Limited; PricewaterhouseCoopers (Netherlands Antilles ); John W. Bendall, Jr.; Richard Geist;  Anthony Stocks; Kieran Conroy; and Declan Quilligan |

04 - 60196 CIV-COHN

MAGISTRATE JUDGE SNOW

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT |
|---|---|
| Montreal, Quebec, Canada | New York, New York, USA |
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| *County where action arose Broward* | |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| DAVID C. CIMO, ESQ. | |
| Genovese Joblove & Battista, P.A. | |
| 100 S.E. Second Street, Miami, Florida 33131 | |
| Tel: 305-349-2300 | |

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties IN Item III)

*0: 04CV 00196 Cohn-Snow*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place Of Business in Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/ PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | | | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 310 Airplane | ☐ 362 Personal Injury — Med Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 315 Airplane Product Liability | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Injury Product Liability | ☐ 650 Airline Regs. | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 660 Occupational Safety/Health | ☐ 820 Copyrights | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 830 Patent | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | | ☐ 840 Trademark | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| | | | | ☐ 864 SSID Title XVI | |
| | | | | ☐ 865 RSI (405(g)) | |

| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | |
|---|---|---|---|
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br>Sentence<br>HABEAS CORPUS:<br>☐ 530 General☐<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other☐<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **FEDERAL TAX SUITS**<br><br>☐ 870 Taxes (U.S. Plaintiff<br>or Defendant)<br><br>☐ 871 IRS ☐ Third Party<br>26 USC 7609 |

## V. ORIGIN *(PLACE AN x IN ONE BOX ONLY)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  Transferred from ☐ 5 another district (Specify)  ☐ 6 Multidistrict Litigation  Appeal to District ☐ 7 Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) 15 U.S.C. § 78aa; 28 U.S.C. §§ 754, 1331, 1367, 1391; Securities Exchange Act of 1934 and Rule 10(b)-5; Breach of Fiduciary Duty; Negligence; Negligent Misrepresentation, Common Law Fraud

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23    **DEMAND $_____**    Check YES only if demanded in complaint: **JURY DEMAND:** ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY *(See Instructions)*
Securities and Exchange Commission v. Michael Lauer, et al (See attached Jan. 8, 2004 Order, page 23, Section IX, Subsection B.)

JUDGE _William J. Zlock_    DOCKET NUMBER ____03-80612-CIV-ZLOCK____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _David C. Ca___ *

FOR OFFICE USE ONLY

RECEIPT # 530411   AMOUNT 150⁰⁰   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

* This is an "ancillary" proceeding being filed before Judge Zloch in accordance with the attached order dated January 8, 2004. (See para. B, p. 24-25 of attached order).

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 03-80612 CIV-ZLOCH

SECURITIES AND EXCHANGE
COMMISSION

        Plaintiff,

        v.                                       **CASE MANAGEMENT ORDER**

MICHAEL LAUER, LANCER
MANAGEMENT GROUP, LLC, and
LANCER MANAGEMENT GROUP II,
LLC,

        Defendants,

and

LANCER OFFSHORE, INC., LANCER
PARTNERS, LP, OMNIFUND, LTD.,
LSPV, INC., and LSPV, LLC,

        Relief Defendants.
_____/



FILED by _____ D.C.

JAN   8 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

        THIS MATTER is before the Court upon the Receiver's Motion for Entry of Case Management Order (DE 42) filed by Marty Steinberg, Esq., court-appointed receiver (hereinafter the "Receiver") of Lancer Management Group, LLC, Lancer Management Group II, LLC, Lancer Offshore, Inc., Omnifund, Ltd., LSPV, Inc., and LSPV, LLC (hereinafter collectively, the "Receivership Entities") in the above-styled cause. The Court has carefully reviewed said Motion, the entire court file and is otherwise fully advised in the premises. Additionally, a hearing regarding the instant Motion was held before the Court on October 28, 2003.

        By prior Orders (DE Nos. 18 and 40) the Court appointed the Receiver to take control and possession the Receivership Entities,

to investigate the affairs of the Receivership Entities and to pursue actions and legal proceedings on behalf of the Receivership Entities and on behalf of the investors and creditors of the Receivership Entities. The Receiver was given broad authority to hire professionals and take actions which the Receiver deems reasonable or necessary to carrying out his appointment. This Order provides additional structure to the Receivership and powers to the Receiver as are necessary to protect and administrate the Receivership Entities. This Order shall in no way limit the rights of the Receiver previously conferred by the Orders Appointing Receiver (DE Nos. 18 and 40) or applicable law. To the extent this Order conflicts with those prior Orders, the prior Orders shall control.

The Court notes that in his proposed Order the Receiver seeks the injunction of all proceedings, suits or actions which may "involve, diminish, or usurp property of the Receiver or the Receivership Entities' estates." Pursuant to the All Writs Act, 28 U.S.C. § 1651 (1994), the Court may issue all writs "necessary to the preservation or exercise of its subject matter jurisdiction." ITT Community Dev. Corp. v. Barton, 569 F.2d 1351, 1359-60 (5th Cir. 1978); see also Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1527 n.13 (11th Cir. 1994). Thus where, as in the above-styled cause, a receiver has been appointed the Court may enjoin competing actions to prevent interference with the administration of the

2

receivership.  See SEC v. Credit Bancorp, Ltd., 93 F. Supp. 2d 475,
477 (S.D.N.Y. 2000) (citations omitted).  Nevertheless, "[c]onduct
not shown to be detrimental to the court's jurisdiction or exercise
thereof cannot be enjoined under the Act."  Mitsubishi Int'l v.
Cardinal Textile Sales, 14 F.3d 1507, 1518 n.17 (11th Cir. 1994).
In Section IX.A of this Order, therefore, all proceedings, actions
and suits which may "diminish or usurp" the assets of the
receivership are enjoined, but those which merely "involve" or have
a relation to those assets are not.

Accordingly, after due consideration, it is

ORDERED AND ADJUDGED as follows:

## I.  STANDING OF RECEIVER

The Receiver shall have the same standing to bring ancillary
suits and actions including, without limitation, suits and actions
by, on behalf of, or against any or all of the Receivership
Entities or Defendant, Michael Lauer (hereinafter "Lauer"), as a
common law receiver and as a bankruptcy trustee under Title 11 of
the United States Code (the "Bankruptcy Code").  The conferral upon
or assertion of such standing by the Receiver shall not divest any
other parties in interest of standing under Section 1109 of the
Bankruptcy Code in the Connecticut Bankruptcy (as defined below).

## II.  THE SEC'S ENFORCEMENT PROCEEDING

The United States Securities and Exchange Commission's
(hereafter the "SEC") enforcement proceeding shall not be

3

consolidated or coordinated with any suits or actions including, without limitation, suits and actions brought by the Receiver, investors or creditors. Specifically, with the exception of the Receiver, no other ancillary party, including, without limitation, investors and creditors, may participate in discovery, the adjudication of issues and/or trial on the merits in the SEC's enforcement proceeding. The SEC's enforcement proceeding shall be governed by an independent scheduling order.

### III. CONNECTICUT BANKRUPTCY CASE

The bankruptcy of In re Lancer Partners, Limited Partnership is currently pending in the United States Bankruptcy Court, District of Connecticut, Case No. 03-50492 (the "Connecticut Bankruptcy"). Two Official Committees have been appointed in the Connecticut Bankruptcy: Committee of Unsecured Creditors (hereinafter the "Creditors' Committee") and Committee of Equity Investors (hereinafter the "Equity Committee" and together with the Creditors' Committee, the "Committees"). This Order is not intended to interfere with the Connecticut Bankruptcy or otherwise usurp the authority of the court in the Connecticut Bankruptcy or the rights of the Committees in that case; provided however that this Order shall not restrict or otherwise limit the Receiver's rights to move the Bankruptcy Court to dismiss or transfer venue of the Connecticut Bankruptcy. This Order establishes procedures for this Proceeding and not the Connecticut Bankruptcy.

4

## IV.   STEERING COMMITTEE

### A.   Formation and Purpose Of Steering Committee

The Receiver is authorized to establish a steering committee (the "Steering Committee") of attorneys to provide input from the investors and creditors to the Receiver in connection with the Proceeding and the administration of the Receivership estate.   The Steering Committee shall not be a voting committee.   The Receiver shall act as the Chairman of the Steering Committee and shall oversee its activities.   All Steering Committee members shall be selected by the Receiver at his sole discretion.   The Court may, however, reduce, increase or change the membership of the Steering Committee.   Each Steering Committee member shall file with the Court an affidavit indicating that such member has no interest (outside the Proceeding) adverse to the Receiver or the receivership estate, similar to that required by the Bankruptcy Code.   The Steering Committee members' participation in the Connecticut Bankruptcy or the proceeding brought by the BVI Financial Services Commission (hereinafter "FSC") in the British Virgin Islands (hereinafter "BVI") shall not be automatically deemed an adverse interest for the purposes of selection of or participation as a member of the Steering Committee.

### B.   Payment of Fees and Costs from Receivership Assets

It is the intent of this Court to compensate Steering Committee members out of the Receivership Estate only when their

5

work has been specifically approved by the Receiver and the Court. Except for good cause shown, and only upon order of the Court, members of the Steering Committee shall be compensated for their reasonable attorneys' or professional fees and costs from the assets of the Receivership Entities only where such fees and/or costs are approved by the Receiver or the Court prior to their commencement. Each of the Receivership Entities shall be jointly and severally liable for all such approved fees and costs of the Steering Committee members allowed in accordance with this Order.

### C.  Steering Committee Document Depository

The Receiver shall maintain, for the benefit of the Steering Committee and its members, a depository of all documents filed and/or produced in this Proceeding, and shall make such documents available to the Steering Committee members and/or their counsel upon request and upon reasonable notice and terms.  The Receiver, at his discretion, may make such documents available in electronic form or through the Internet.

### V.  NOTICE OF PAPERS

### A.  Requests for Notice

To assure proper notice under all circumstances, including expedited matters, a request for service of papers in this Proceeding (a "Request for Notice") may be served upon the Receiver and, for evidentiary purposes, filed with the Court. A Request for Notice shall include: (a) an address at which all documents filed

6

with the Court and served by all entities may be served by U.S. Mail, hand delivery, overnight delivery, and facsimile; (b) the telephone number of each entity requesting service; (c) an electronic mail (e-mail) address for service by e-mail if the entity consents to service by e-mail as set forth in Section V.B. below; (d) the entity's local counsel and the counsel, if any, primarily responsible for matters before the Court but not having an office in the Southern District of Florida.

### B. Service by Electronic Mail

Because electronic mail service often provides the fastest and most economical method of service, the Receiver requests that all parties with regular access to electronic mail consent to service by electronic mail. Any party that indicates its electronic mail address in a Request for Notice shall be deemed to have consented to service by electronic mail unless otherwise requested. Any other party that wishes to consent to service by electronic mail at any time may do so by sending a notice to the Receiver and the Court consenting to service by electronic mail.

### C. Master Service List

All papers (other than: (i) those seeking ex parte relief in accordance with applicable rules of procedure or order of this Court; and (ii) those solely relating to the SEC's enforcement proceeding) filed in this Proceeding shall be served on the following parties (the "Master Service List"):

7

1.  Counsel for the Receiver;

2.  All Members of the Steering Committee;

3.  The Securities and Exchange Commission – Southeast Regional Office (Attn: Kerry A. Zinn, Esq.);

4.  Counsel for the BVI Financial Services Commission in the British Virgin Islands;

5.  The United States Trustee responsible for any Title 11 bankruptcy cases ancillary to this Proceeding;

6.  Counsel for the Committees and other counsel for any official, statutory creditors' committees appointed in any Title 11 bankruptcy cases ancillary to this Proceeding;

7.  Any trustee appointed in any Title 11 bankruptcy case ancillary to this Proceeding;

8.  Any parties and entities (including local government units) previously known by the party serving the paper to be served to have a particularized interest in the subject of such paper; and

9.  Any real parties in interest that file a Request for Notice and serve the same upon the Receiver prior to the filing of the paper to be served.

The Receiver shall be responsible for maintaining the Master Service List, which shall be updated monthly. An updated Master Service List shall be made available to any party in interest by

8

request presented to counsel for the Receiver.

D.  Method of Service of Requests for Relief and Other Papers

All entities seeking relief from this Court in this Proceeding are authorized to serve such requests for relief and other papers by U.S. Mail, hand delivery, overnight delivery, facsimile or, if a party to be served has so consented or deemed to have consented, by electronic mail. Service on the Receiver shall be by electronic mail and one of the following: U.S. Mail, hand delivery, overnight delivery, or facsimile. Any party that cannot serve a paper by electronic mail must serve the paper on the Receiver by hand delivery, overnight delivery, or facsimile.

1.  Service of Responses to Requests for Relief Served Via Facsimile, Hand Delivery, or Electronic Mail

Unless otherwise ordered by the Court, if any entity files any request for relief and serves the same by facsimile, hand delivery, or electronic mail, then all parties shall have ten (10) business days from the date of service of such request for relief to file with the Court and serve upon the Receiver, the Master Service List and the party seeking relief an objection or opposition to such motion, application, notice, or other paper.

2.  Service of Responses to Requests for Relief Served Via U.S. Mail

Unless otherwise ordered by the Court, if any entity files any request for relief and serves the same by U.S. Mail, then all parties shall have twelve (12) business days from the date of

9

service of such request for relief to file and serve upon the Receiver, the Master Service List, and the party seeking relief an objection or opposition to such motion, application, notice, or other paper.

3. Service of Response to Request for Relief Set for Hearing

Unless otherwise ordered by the Court, if a request for relief has been set for hearing, the Court shall not consider any response or objection to such request for relief or any reply to such response or objection filed less than three (3) business days before the date of such hearing.

4. Failure to Timely Object

If no party timely objects to a motion, application, notice, or other paper filed, then any and all relief requested therein may be granted by the Court without the necessity for any hearing or further consideration. Nothing in this Order, however, shall bar any party from requesting a hearing despite the absence of a response or objection.

5. Service of Replies

Unless otherwise ordered by the Court, all replies to objections or responses to requests for relief shall be filed within five (5) business days from the filing date of such objection or response.

6. Service of Orders

All parties submitting orders for entry by the Court shall

10

serve a conformed copy of any entered order on the Receiver and the SEC within two business days of entry and shall serve such entered order on the Master Service List and any other interested parties within five business days after entry.

7.  Certificates of Service

All parties shall include in any papers filed with the Court a Certificate of Service identifying all parties served and the manner of service.

8.  Notice of Objection Procedures

All filings seeking relief shall include a statement of the applicable deadline for filing and serving objections as provided in this Order as follows:

**If no party files and serves an objection to the relief requested herein on or before [DATE OF OBJECTION DEADLINE], the relief shall automatically be deemed granted without further order of this Court.**

9.  Special Notice Procedures

Nothing herein shall prejudice the right of any entity to move the Court to further limit or expand notice of requests for relief and/or other contested matters upon a showing of good cause, including, without limitation, the right to file a motion seeking emergency or ex parte relief.

10.  Negative Notice Procedures

Unless otherwise ordered by the Court, the Receiver may

11

procure authority to do the following via ten (10) days negative notice:

1. Abandon property of the Receivership Entities that is burdensome or of inconsequential value;

2. Settle, compromise, or dismiss contested matters, adversary proceedings, or any other ancillary litigation;

3. Retain professionals, subject to the conditions set forth herein; and

4. Compensate professionals from assets of the Receivership Estate, subject to the conditions set forth herein.

To procure such relief via negative notice, the Receiver shall serve on all parties on the Master Service List a notice indicating the Receiver's intent (a "Notice of Intention") and briefly describe the grounds therefor. The Notice of Intention shall state the following:

**If no party files and serves an objection to this Notice on or before [DATE OF OBJECTION DEADLINE] the Receiver shall be automatically empowered to perform the intended action without further order from this Court.**

12

## VI.   OMNIBUS HEARINGS

### A.   All Matters to be Heard

The following contested matters will be considered and/or heard only at periodic omnibus hearings scheduled in advance by the Court (the "Omnibus Hearings"), unless the Court orders otherwise: all motions, pleadings, applications, and other requests for relief, all objections and responses, and replies thereto, and all other matters.

### B.   Setting Hearings

### 1.   Ordinary Scheduling Procedures

Motions shall be set on the next Omnibus Hearing date that is at least ten (10) days after the filing of the request for relief but at least seven (7) days prior to the Omnibus Hearing.   Each motion or request for relief shall be accompanied by a form "Notice of Hearing".

### 2.   Emergency Hearings

Notwithstanding any procedure established herein, this Order shall not restrict any interested party from requesting an emergency hearing pursuant to the Local Rules of this Court.

### C.   First Three Omnibus Hearings

To the extent necessary, the Court has set aside the following dates and times for the first three Omnibus Hearings:

1.   11:30 am on the 20th day of February, 2004.

2.   10 am on the 23rd day of April, 2004.

13

3.    10 am on the 18th day of June, 2004.

### D.  Future Hearings

At or before the last Omnibus Hearing scheduled above, the Receiver or other party in interest may request scheduling of additional Omnibus Hearings. Entities may contact Craig V. Rasile, Hunton & Williams LLP, 1111 Brickell Avenue, Suite 2500, Miami, FL 33131, Phone (305) 810-2500, Fax (305) 810-2460, for information concerning future Omnibus Hearings scheduled by the Court.

### E.  Agenda Letters

No later than twenty-four (24) hours before each Omnibus Hearing, the Receiver shall file with the Court a letter setting forth each matter to be heard at such hearing and the proposed order in which such matters will be heard (the "Agenda Letter"). The Receiver shall serve the Agenda Letter on the Master Service List, on each entity affected by any item indicated in the Agenda Letter and on each entity that has filed and served papers with this Court relevant to such hearing in accordance with the procedures set forth herein.

### F.  The SEC's Enforcement Proceeding

The SEC's enforcement proceeding is not subject to Sections VI. A through F of this Order.  Any motions, pleadings, applications or other requests for relief, objection, responses and replies in the SEC's enforcement proceeding may be considered and/or heard at any time as determined by the Court.

14

## VII.   RETENTION AND COMPENSATION OF PROFESSIONALS

### A.   Retention of professionals

#### 1.  Notice of Retention

The Receiver, or any attorney, accountant, consultant, agent or other professional being engaged by the Receiver pursuant to the provisions of the Receivership Order (a "Professional") shall file with the Court a notice indicating the Receiver's intent to retain a Professional (a "Notice of Intention to Retain Professional"). The Notice of Intention to Retain Professional shall identify the name of the professional firm, the individual(s) who will render professional services, the scope and terms of the retention of such Professional, the effective date of the retention, and the proposed hourly rates to be charged by such Professional.  Any material additional engagement terms shall be disclosed or attached to the Notice of Intention to Retain Professional along with an affidavit of the Professional stating that the Professional does not hold or represent any interest adverse to the Receivership Estate and is a "disinterested" person.

#### 2.  Retention of Former Professionals

The Receiver may retain a Professional that has represented the Receivership Entities prior to the Receiver's appointment if such Professional does not represent or hold any interest adverse to the Receiver or the Receivership Estate with respect to the matter on which such Professional is to be employed.

15

3.  Objections to Retention

If no objection to a Notice of Intention to Retain Professional is timely filed in accordance with this Order, then the engagement proposed in the Notice of Intention to Retain Professional shall be deemed approved by the Court in all respects without further order.

B.  Compensation of Professionals

1.  Interim Applications for Compensation

Any Professional, any Steering Committee member (as provided in Section IV.B. above) or the Receiver, on behalf of himself or any Professional, may file a Request for Interim Compensation or a Notice of Intention to Pay Interim Compensation (both a "Notice of Compensation") no less than every sixty (60) days.  All Notices of Compensation shall set forth the amount of fees and costs requested; a summary of prior Notices of Compensation reflecting the amount of fees previously requested, awarded and paid; and a brief summary of the services rendered during the relevant period. All Notices of Compensation shall have attached as an exhibit a schedule broken down into categories pre-determined by the Receiver showing the amount of fees and costs requested in each category, including a list of the billing persons, the hourly rates and amount of time spent in each category.  No compensation will be paid by the Receiver before thirty (30) days of service of a Notice of Compensation to ensure that even if no party in interest objects

16

within ten (10) days of service, the Court will have an additional
twenty (20) days to consider the Notice of Compensation and, if the
court deems necessary, schedule a hearing on the Notice of
Compensation.

<u>2.  Objections to Interim Compensation</u>

All objections to a Notice of Compensation must be filed
within ten (10) days after service of the Notice of Compensation.
If an objection is timely filed, the Court shall set the matter for
hearing or enter an order allowing in full, allowing in part or
disallowing the Notice of Compensation as the Court deems
appropriate.

<u>3.  Court Consideration of Unopposed Notices</u>

If no objection is filed within ten (10) days of service of a
Notice of Compensation, then the Court will take the Notice under
advisement in order to evaluate the reasonableness of the requested
compensation. Within twenty (20) days of the expiration of the
time to file an objection, the Court shall either: (i) issue an
order allowing in full, allowing in part, or disallowing the
requested compensation; or (ii) set the Notice of Compensation for
hearing at the next available omnibus hearing date or such other
date the Court deems appropriate. If the Court does not enter an
order on an unopposed Notice of Compensation or set an unopposed
Notice for hearing, within the period prescribed herein then the
compensation requested in the unopposed Notice of Compensation

17

shall be deemed allowed as requested, without further order of the Court.

4.  Resolution of Objections and Amended Notices

If the applicant and an objecting party are able to resolve an objection to a Notice of Compensation to the satisfaction of the Receiver, without judicial intervention, then the Receiver shall file and serve a Notice of Intention to Pay Agreed Amended Compensation setting forth the manner in which the objection was resolved, which notice shall be executed by both the applicant and the objecting party. Such notice shall be served by the Receiver upon all parties on the Master Service List and shall be subject to approval and payment as if it were an original Notice of Intention to Pay Interim Compensation.

5.  Payment of Fees by Receiver

The Receiver shall pay fees and expenses approved by the Court to the extent the Receiver is in possession of sufficient funds in the Receivership Estate at such time.

6.  Final Applications for Compensation

At the conclusion of this case or upon the termination of services by the Receiver, Professional or any Steering Committee member compensated pursuant to this Section, such entity shall file a Final Application for Allowance of Compensation which shall not be subject to automatic or negative notice allowance but shall be considered by the Court notwithstanding the existence or absence of

18

any timely objections.   All interim fees and expenses paid are subject to disallowance and/or disgorgement until entry of the Order Granting a Final Application for Compensation.

## VIII.   COMMUNICATIONS AND CONFIDENTIALITY

### A.   Maintenance of Confidentiality

The Receiver, the FSC and the Steering Committee share a common interest in maximizing the recovery for the investors and creditors of the Receivership Entities.       Accordingly, communications among the Receiver, the FSC, the Steering Committee and its members and their respective counsel (collectively the "Confidential Parties") which contain privileged communications, work product information, common interest or joint defense information, critical self-analysis information, and other applicable privileges are hereby deemed confidential and shall be protected from disclosure to any third party under such privileges.

### 1.  Confidential Materials

The Confidential Parties also conclude that, from time to time, their mutual interests will be best served by sharing privileged, work product, common interest or joint defense, critical self-analysis or other similar materials, including, but not limited to, documents, factual material, mental impressions, memoranda, interview reports, notes, opinions, legal analysis and advice and other matters, including the confidences of each other (collectively the "Confidential Materials").    Confidential

19

Materials, whether shared as herein contemplated or not, are and would be privileged from disclosure to adverse or other parties as a result of the attorney-client privilege, the attorney work-product doctrine, common interest or joint defense doctrines, the critical self-analysis doctrine and other applicable privileges.

## 2.  Use of Confidential Materials

Any Confidential Materials exchanged between or among the Confidential Parties, and the information contained therein, and any other confidences exchanged between or among counsel, shall be used solely in connection with preparing for and prosecuting matters in this Proceeding, the Connecticut Bankruptcy, and, where appropriate, in proceedings ancillary to this Proceeding. Furthermore, no information, communications or defense materials exchanged among the Confidential Parties may be used in any proceeding involving any Confidential Party that may be entitled to claim any privilege with respect to such information, communications or defense materials without the express written consent of such Confidential Party.  If any Confidential Materials are to be used in deposition or other discovery procedures, the parties engaged in such discovery shall execute a separate confidentiality agreement governing the use of such documents in discovery.

## 3.  Consent of Interested Confidential Parties

No Confidential Party shall disclose information,

20

communications or defense materials received from another Confidential Party, or the contents thereof, to anyone except their respective clients, attorneys within their firms, or their employees, agents or experts, without first obtaining the written consent of any Confidential Party that may be entitled to claim any privilege with respect to such materials, as well as the written consent of the Party's counsel. Further, no information, communications or defense materials exchanged under this agreement, may be used in any proceeding involving any Party who may be entitled to claim any privilege with respect to such information, communications or defense materials without the express written consent of such Party and such Party's counsel.

4.  No Obligation to Share Confidential or Other Materials

While it is the intent that Confidential Materials be exchanged between and among Confidential Parties, nothing in this Order shall be construed as giving rise to any obligation on behalf of any Confidential Party to share any information, communications or Confidential Materials with any other Confidential Party.

5.  Termination of Confidential Relationship

The Court may, upon request by a Confidential Party and after notice and a hearing, terminate the confidential relationships established herein with respect to any Confidential Party. The effect of such termination shall be prospective only and will not affect the Confidential Parties' obligation to hold confidential

21

all Confidential Materials, communications and information exchanged prior to the entry of an order terminating a confidential relationship established by this Order. Moreover, termination of any of the confidential relationships established by this Order shall not create any conflict of interest and shall not be used as a basis to disqualify the counsel of any Confidential Party.

5. Withdrawal of Confidential Party

Each Confidential Party may withdraw or voluntarily terminate prospectively by written notice to all Confidential Parties should it be determined that it is no longer in its interest to continue a joint defense. The effect of withdrawal shall be prospective only and will not affect the Confidential Parties' mutual obligation to hold confidential all defense materials, communications and information exchanged prior to receipt of written notice of withdrawal. Moreover, the Confidential Parties agree that the act of withdrawal will not create any conflict of interest and will not be used as a basis to disqualify the counsel of the withdrawing Party from continuing to represent such Party. To the extent that withdrawal might be considered to create a conflict of interest, however, the Confidential Parties are deemed to have waived any such conflict.

B. Penalty for Breach of Confidentiality

The Court hereby finds that any violation of the confidentiality provisions of this Order shall be the cause of

22

irreparable harm to any Confidential Parties affected by such breach, and finds that monetary damages may not provide sufficient relief for such a breach. In the event of a violation of the confidentiality provisions of this Order, the Court shall impose any specific performance or injunctive relief necessary to prevent the irreparable harm flowing from such breach, in addition to monetary sanctions if appropriate.

### C. Retroactive Application

All communications involving Confidential Materials among the Confidential Parties prior to the date of this Order are subject to the confidentiality provisions of this Order.

### IX. ANCILLARY PROCEEDINGS

### A. Injunction

The Court hereby enjoins any party (excluding the Receiver, the SEC, the National Association of Securities Dealers (the "NASD"), and/or any other regulatory body or law enforcement agency of the United States or its constituent states) with notice of this Order from initiating, maintaining, or in any way prosecuting in any other court any proceeding, suit, or action against any of the above-named Defendants and/or Relief Defendants. Additionally, the Court hereby enjoins any party (excluding the Receiver, the SEC, the NASD, any other regulatory body or law enforcement agency of the United States or its constituent states or any party with the express written consent of the Receiver or this Court) with notice

23

of this Order from initiating, maintaining, or in any way prosecuting in any court any proceeding, suit or action that may diminish or usurp property of the Receiver or the Receivership Entities' estates, including, but not limited to, causes of action that the Receiver may have standing to bring or that may belong to the Receiver, any investors, any class or group of investors, and/or any member of the Steering Committee against the Receivership Entities' former principals, professionals or other third parties. Unless otherwise expressly authorized by the Receiver or the Court, such proceedings, suits, and actions must be brought in the form of a proceeding ancillary to this Proceeding pursuant to this Order. The Receiver may provide effective notice of the channeling injunction contained in this Order by publication as provided for in the Federal Rules of Civil Procedure, or by filing notice of this Order in any such proceedings, suits and actions brought prior to the entry of this Order.

### B.  Proceedings Ancillary to this Case

Any party may initiate a proceeding ancillary to this Case by: (i) filing an ancillary complaint in this Court and serving such complaint in compliance with the Federal Rules of Civil Procedure; (ii) obtaining a court order transferring the venue of any of the Receivership Entities' cases filed under any chapter of the Bankruptcy Code in another district; or (iii) obtaining an order, administrative decision, or other document to which comity attaches

24

providing for the involvement of this Court and/or the Receiver in any of the Receivership Entities' foreign insolvency, bankruptcy, administrative or liquidation proceedings.

1.  Maintenance of Ancillary Proceeding Files and Transfer to This Court

The Clerk of Court shall assign all ancillary proceedings initiated by the Receiver or any other party pursuant to the Receivership Order or Section IX.B. of this Order a separate case number, and all such ancillary proceedings shall be transferred to this Court and subject to this Order and subsequent pretrial orders.

C.  Other Bankruptcy Proceedings

The Receiver is hereby authorized to file cases under any chapter of the Bankruptcy Code or file motions to transfer venue of any pending or subsequently filed bankruptcy cases for any of the Defendants or Relief Defendants that the Receiver deems appropriate.  All such cases shall be filed in or transferred to the Southern District of Florida and the reference shall be withdrawn to this Court by separate Order.

X.  REPORTING REQUIREMENTS

After the initial report required by the Receivership Order, the Receiver shall file and serve the next four status reports with the Court quarterly and will file all other reports thereafter semi-annually.

25

## XI.  PRESERVATION OF DOCUMENTS

### A.  Retention Injunction

Each of the parties to this Proceeding, including the Confidential Parties, each of the parties to any proceeding ancillary to this Proceeding, and any person or entity with notice of this Order that provided products or services to the Receivership Entities and/or received funds from the Receivership Entities, and their respective officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive any notice of this Order are hereby restrained and enjoined from altering, interlining, destroying, permitting the destruction of, or in any other fashion changing any "document" in the actual or constructive care, custody or control of such person, wherever such document is physically located ("Documents").  Such persons are also enjoined from changing the location of any such Documents except to facilitate compilation, review, or production to the Receiver.  The Receiver may provide effective notice of the retention injunction contained in this Order by service in accordance with this Order or publication as provided for in the Federal Rules of Civil Procedure.

### B.  Scope of Retention Injunction

1.  Definition of "Document"

"Document" shall mean any writing, drawing, film, videotape,

26

chart, photograph, phonograph record, tape record, mechanical or electronic sound recording or transcript thereof, retrievable date (whether carded, taped, coded, electrostatically or electromechanically recorded, or otherwise), or other data compilation from which information can be obtained, including, but not limited to, notices, memoranda, diaries, minutes, purchase records, purchase invoices, market data, correspondence, computer storage tapes, computer storage cards or discs, computer memories, books, journals, ledgers, statements, reports, invoices, bills, vouchers, worksheets, work papers, work orders, sale orders, purchase orders, jottings, notes, letters, abstracts, audits, financial statements, charts, checks, wire transfer confirmations, diagrams, drafts, recordings, instructions, lists, logs, orders, recitals, telegram messages, telephone bills and logs, resumes, summaries, compilations, computations, and other formal and informal writings or tangible preservations of information.

## 2.  Relevance Limitation

The document retention injunction contained herein pertains only to documents containing information that may be relevant to, or may lead to the discovery of information relevant to, the activities of the Receivership Entities or Lauer, the activities of the Receivership Entities' or Lauer's portfolio companies, and the activities of any entity receiving monies from or performing services of any kind for the Receivership Entities or Lauer. Any

27

document described or referred to in any discovery request made during this litigation shall, from the time of the request, be treated for purposes of this order as containing such information unless and until the court rules such information to be irrelevant.

3.  Disputes Over Retention

Counsel shall confer to resolve questions as to what documents are outside the scope of the document retention injunction and as to an earlier date for permissible destruction of particular categories of documents.  If counsel are unable to agree, then any party may apply to the court for clarification or relief from the document retention injunction.  Notwithstanding this provision, a party waives any objection to the destruction of any document by failing to object to such destruction within sixty (60) days after receiving notice of another party's intention to destroy such document.

4.  Implementation; Responsible Individual

Each party to this Case (excluding the SEC) shall, within ten (10) days after receiving this Order, designate an individual who shall be responsible for ensuring that the party carries out the requirements of this Order.

### XII.  CLAIMS PROCEDURES

A.  Application of this Order

All persons or entities with claims or demands against any Receivership Entity must present their claims to the Receiver in

28

accordance with this Order. This requirement applies to all persons and entities, whether or not parties to this Proceeding. Persons or entities who have already submitted claim forms to the Receiver are not required to file additional claim forms.

### B. Claim Requirements

All claims filed against the Receivership Entities in this Proceeding shall be substantially in the form provided by the Receiver. Each claim shall be signed by the Claimant under penalty of perjury and shall be filed against the Receivership Entity that is obligated or liable to Claimant. The Receiver shall provide the claim form by electronic mail, by hard copy or by posting on a website.

### C. Claims Bar Date

The claims bar date is April 1, 2004.

### 1. Notice of Claims Bar Date

a) Mail Notice

The Receiver shall provide notice of the claims bar date indicated in this Section of this Order and a form for filing any claim to all parties on the Master Service List and upon all known investors and creditors of the Receivership Entities, by bulk rate U.S. Mail, on or before January 23, 2004. The Receiver is directed to create an appropriate form of notice.

b) Publication Notice

The Receiver is directed to publish, before January 23, 2004,

29

a legal notice for three consecutive weekdays in the USA Today and such other publications the Receiver deems appropriate under the circumstances, for the purpose of informing all persons of the claims bar date.

**D.  Bar Date Injunction**

All creditors, claimants, and other persons failing to present claims and supporting proof to the Receiver postmarked on or before the claims bar date will be forever barred from participating in any distribution of the assets of the Receivership Entities and shall be further barred from asserting set-offs or recoupment of any kind whatsoever against any Receivership Entity or its assets.

**E.  Claims Review Process**

After the Receiver has received the executed claim forms and the claims bar date has passed, the Receiver shall file a motion for an order detailing and approving the criteria and methodology to be used in reviewing the claims and their attached documentation to determine whether the claims should be allowed in full, allowed in part, or disallowed.

**1.  Insufficient Claim Documentation**

If the Receiver determines that a claim form has been improperly completed and/or that a claim lacks sufficient supporting documentation, then the Receiver shall send the claimant a notice of insufficient documentation indicating that the claimant

30

shall have thirty (30) days in which to supplement the documentation supporting the claim at issue. Failure to timely supplement shall result in a recommendation of disallowance.

2. Omnibus Objections by Receiver

Upon completion of the Receiver's review of the claims, the Receiver shall file with the Court an accounting of all claims submitted. The Receiver shall also file one or more omnibus objections specifying those claims which the Receiver recommends for disallowance, in whole or in part, and the basis for each objection (the "Objection").

The Receiver shall serve the Objection upon (i) any party holding a claim recommended for disallowance, and (ii) the SEC. The Objection shall state briefly the reasons for the recommendation of disallowance and the amount, if any, the Receiver recommends for allowance. A claimant that disputes the Receiver's recommendation shall file and serve the Receiver with a response to the Receiver's Objection within thirty (30) days after the mailing of the Objection. Failure to timely file and serve a response will result in adoption of the Receiver's recommendation. The Court shall set a hearing on any such responses which have not been resolved by agreement with the Receiver within thirty (30) days after the filing of the response.

**XIII.   PUBLIC ACCESS VIA TOLL FREE NUMBER AND WEBSITE**

The Receiver shall establish and maintain a toll-free number,

31

currently (866) 285-5897, to receive investor and creditor questions. The Receiver may also be contacted via electronic mail at lancer@hunton.com. Additionally, the Receiver shall maintain an informational website at the following:

> http://www.hunton.com/news_events/legal_dev/Lancer_Re
> ceivership_Information.html

which website may contain status reports and selected pleadings from this Proceeding or any proceedings ancillary hereto, which reports and/or pleadings shall be chosen and displayed at the Receiver's sole discretion.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 8th day of January, 2004.

WILLIAM J. ZLOCH
Chief United States District Judge

Copies furnished:

All attorneys of record

32